GOLTERMANN v. SCHIERMEYER, *Appellant.*

In Banc, July 2, 1892.

1. **Public Land:** GOVERNMENT SURVEY: PLAT.  The government sold the north half of a section to plaintiff's predecessors, and set off to the state the south half for schools by reference to the survey and plat

Goltermann v. Schiermeyer.

returned by the surveyor general; *held*, that the location of the dividing line between the north and south half must be determined from such plat; and the acts of congress relating to the survey of the public domain.

2. ———: ———: ———: PATENT. Where the government patent for land refers to the official plat of the surveyor general, returned to the general land-office, for a description of the land patented, the plat with figures and marks thereon, and the field notes become a part of the patent for the purpose of identifying the land granted.

3. ———: ———: ———: ———. Where the government accepts a plat of its land and sells pursuant to the plat, it only remains for the court to ascertain and give effect to its meaning.

4. ———: ———: FRACTIONAL TOWNSHIP. Townships are fractional when the outer boundary lines cannot be carried out in full because of a watercourse, Indian boundary or some other external interference.

5. Land Title: ADJOINING PROPRIETORS: DIVISION LINE: ADVERSE POSSESSION. Where one of two adjoining land proprietors builds a fence upon what he supposes is the true line, and takes possession of the land so inclosed, without claiming or intending to claim beyond the true line when afterwards ascertained, his possession of a part of the adjoining owner's land included in the inclosure is not adverse.

6. ———: ———: ———: ———. Where on the other hand one of two adjoining proprietors takes and holds possession up to a fence which he supposes is on the true line, claiming to the fence, his possession is adverse to all the land within his inclosure.

7. ———: ———: ———: ———. The fact that he claimed to the fence, not simply to the true line when ascertained, is sufficient to constitute a disseizin.

8. ———: COLOR OF TITLE. Color of title cannot extend beyond the boundaries specified in the grant.

9. ———: ———: POSSESSION OF PART OF A TRACT. Where, however, plaintiff is the rightful owner of his farm and is in possession of a part, that possession will draw to him possession of all the land embraced in his muniments of title, which is not in the actual, exclusive possession of another, and this is true even if the latter has color of title.

10. ———: ADVERSE POSSESSION. Plaintiff and those under whom he claims for a period of thirty years made no claim to any land south of a certain line, during which time defendant claimed the land up to the line of which claim plaintiff had notice. It is timber land, and has been used for thirty years by defendant in connection with his farm for obtaining wood, rails and logs therefrom, and has been

inclosed by him for about five years. *Held*, that defendant had such exclusive, adverse possession as constituted "actual exclusive possession for more than ten years."

11. **Land Title**: ADJOINING PROPRIETORS: AGREED LINE. Where there is a dispute as to the true division line between adjoining proprietors, or the line is uncertain, and they being ignorant of its true location agree upon a permanent division line, and take possession accordingly, such agreement is binding on them and those claiming under them.

*Appeal from St. Charles Circuit Court.*—HON. W. W. EDWARDS, Judge.

REVERSED AND REMANDED.

*Theodore Bruere* and *T. F. McDearmon* for appellant.

(1) The true division line between the north half and the south half of section 31, township 46, range 1, east, is the line claimed by defendant, established by Arnold Krekel, county surveyor of St. Charles county, in 1847, and running from the original United States quarter section corner in the east line parallel with the southern line of said section, to a corner in the west line thereof. The court, therefore, committed error in giving instructions, numbered 3, 4, 5 and 7, asked by plaintiff, and refusing instructions, numbered 9 and 10, asked by defendant. Revised Statutes of the United States, sec. 2396; *Knight v. Elliott*, 57 Mo. 322; Revised Statutes, 1889, sec. 8328; Revised Statutes, 1879, sec. 7398; *Jacobs v. Moseley*, 91 Mo. 457. (2) The court gave improper instructions at the request of plaintiff, and refused to give proper instructions at the request of defendant, defining adverse possession. *Luper v. Baker*, 68 Mo. 400; *Tayon v. Ladue*, 33 Mo. 205; *Schultz v. Lindell*, 30 Mo. 310; *Draper v. Shoot*, 25 Mo. 197; *Prewitt v. Burnett*, 46 Mo. 372; *Fugate v. Pierce*, 49 Mo. 441; *Music v. Barney*, 49 Mo. 458; *Bowman v.*

*Lee,* 48 Mo. 335; *Crispen v. Hannavan,* 50 Mo. 550; *Bartlett v. Donoghue,* 72 Mo. 563; *Cole v. Parker,* 70 Mo. 372; *Knowlton v. Smith,* 36 Mo. 507; *Thomas v. Babb,* 45 Mo. 384; *Tamm v. Kellogg,* 49 Mo. 118; *Walbrunn v. Ballen,* 68 Mo. 164; *Handlan v. McManus,* 100 Mo. 124; *Atchison v. Pease,* 96 Mo. 566; *State v. Whelehon,* 102 Mo. 17. (3) The court gave improper instructions for the plaintiff, and refused proper instructions for the defendant, on the question of an agreed line. *Turner v. Baker,* 64 Mo. 218; *Taylor v. Zepp,* 14 Mo. 488; *Blair v. Smith,* 16 Mo. 281; *Acton v. Dooley,* 74 Mo. 63; *Allen v. Sales,* 56 Mo. 28; *Hamilton v. West,* 63 Mo. 93; *Thomas v. Pullis,* 56 Mo. 211; *Dolde v. Vodicka,* 49 Mo. 98; *Lindell v. McLaughlin,* 30 Mo. 28; *Soward v. Johnston,* 65 Mo. 102; *Melton v. Smith,* 65 Mo. 315; *Slagel v. Murdock,* 65 Mo. 522; *Lemmon v. Hartsook,* 80 Mo. 13; *Dibble v. Rogers,* 13 Wend. 536; *Rockwell v. Adams,* 6 Wend. 467; *McCormack v. Barnum,* 10 Wend. 104; *Jackson v. McConnell,* 12 Wend. 421. (4) The plaintiff was estopped by his acts and the acts of those under whom he claims from denying the correctness of the line surveyed and established by Arnold Krekel in 1847, and the courts should have so held and taken the case away from the jury; or at least given defendant's instruction, numbered 13, which presented this question to the jury. *Lemmon v. Hartsook,* 80 Mo. 13; *Majors' Heir v. Rows,* 57 Mo. 384; *Cooper v. Verra,* 59 Cal. 282; *King v. Mabrey,* 3 Lea (Tenn.) 237; *Davis v. Lodge,* 46 Vt. 655; *Johnson v. Brown,* 63 Cal. 391; *Pierson v. Mosher,* 30 Barb. 81; *Baldwin v. Brown,* 16 N. Y. 359; *Spaulding v. Warren,* 25 Vt. 316; *Smith v. McAlister,* 14 Barb. 404; *Case v. Trapp,* 49 Mich. 59. (5) The court erred in permitting the stenographer's notes of the defendant's testimony at a former trial to be read in evidence. *Leeser v. Boekhoff,* 38 Mo. App. 445;

*Pennsylvania Co. v. Marion*, 123 Ind. 415; *Hammond v. Dyke*, 42 Minn. 273. It appears from the record that the judgment as entered up is erroneous, and should be set aside.

*Mudd & Mudd, H. C. Lackland* and *C. W. Wilson* for respondent.

(1) Plaintiff's instructions, numbered 1, 2, 3, 4, 5 and 6, in relation to the location of the dividing line between the northern and southern halves of section 31, correctly declare the law. They direct the location of the quarter section corner, and the dividing line between the half sections, in exact accordance with the regulations of the United States land department and of the United States statutes. That is to say, so as to suit the calculations of the areas of the quarter sections adjoining the township boundaries as expressed upon the official township plat. United States Revised Statutes [Ed. 1878] sec. 2396; Public Domain (1883), p. 673, sec. 6, last clause. The laws of the United States and regulations of the land department must govern in the case. *Knight v. Elliott*, 57 Mo. 317; *Lemmon v. Hartsook*, 80 Mo. 19. (2) Plaintiff's instructions, numbered 9 and 10, are correct declarations of the law of the case. *Schad v. Sharp*, 95 Mo. 574; *Jacobs v. Moseley*, 91 Mo. 457; *Keen v. Schnedler*, 92 Mo. 516; *University v. McCune*, 28 Mo. 482; *Thomas v. Babb*, 45 Mo. 387; *Crawford v. Ahrnes*, 103 Mo. 88; *Knowlton v. Smith*, 36 Mo. 507. (3) *First.* Plaintiff's instructions, numbered 11, 12, 13, 14, 15 and 16, all on the subject of adverse possession, or the application of the statutes of limitations to the case, correctly declare the law of the case. *Keen v. Schnedler*, 92 Mo. 516; *Doan v. Sloan*, 42 Mo. 106–112; *Pike v. Robertson*, 79 Mo. 618, 619; *Bradley v. West*, 60 Mo. 33, 37, 38; *Knowlton v. Smith*, 36 Mo. 507–514; Angell on Limita-

tions [5 Ed.] sec. 390, p. 387; *Degraw v. Taylor*, 37
Mo. 310, 311. *Second.* The law presumes that the
party in possession holds in subserviency to the rights
of the true owner. The burden is upon him, who
claims title by adverse possession, to prove his title.
The character of his possession is always determined
by the intent with which he held. *Knowlton v. Smith*,
.36 Mo. 514; *Cutter v. Waddingham*, 22 Mo. 267;
*Bradley v. West*, 60 Mo. 41; *Crawford v. Ahrnes*, 103
Mo. 88; *Thomas v. Babb*, 45 Mo. 387. When the true
-owner is in actual possession of a portion of his land,
nothing short of actual occupation (by inclosure or
-cultivation) can oust him, even though the adverse
claimant has color of title. *Bradley v. West*, 60 Mo.
40, 41. *Possessio pedis* is essential in such a case.
*Griffith v. Schwenderman*, 27 Mo. 412; *Schultz v. Lindell*;
:30 Mo. 310, 316, 317; *Crispen v. Hannavan*, 50 Mo.
536; *St. Louis v. Gorman*, 29 Mo. 593. (4) *First.*
Plaintiff's instructions, numbered 17 and 18, are proper
declarations of law on the subject of an agreed line.
An agreed line can be established only by agreement
between the adjoining proprietors. These instructions
give no directions as to the character of evidence that
is required to prove the agreement. They do not
require positive and direct evidence of the agreement.
·*Jacobs v. Moseley*, 91 Mo. 462, 463; *Schad v. Sharp*, 95
Mo. 578, 579. *Second.* Really there was no evidence
in the case to justify the submission of this issue to the
jury, and plaintiff objected to its being dragged into
the case. *Third.* But the defendant having asked the
-court for instructions submitting the question to the
jury will not be heard to complain. *Keen v. Schnedler*,
92 Mo. 516–526; *Crutchfield v. Railroad*, 64 Mo. 255;
*Davis v. Brown*, 67 Mo. 313; *McGonigle v. Dougherty*,
71 Mo. 259, 265; *Bank v. Hammerslough*, 72 Mo. 274;
.*Smith v. Calligan*, 74 Mo. 388; *Bettes v. Magoon*, 85 Mo.

580–586. The court properly refused the instructions. asked by the defendant that were refused. (5) The court properly allowed the official stenographer, Robinson, to testify as to the statements made by the defendant when on the witness stand on the former trial of the cause. It was competent for the plaintiff to prove any admission of the defendant against his own interest. The witness testified that his report of the defendant's testimony was correct. *Bogie v. Nolan*, 96 Mo. 90; *Davis v. Plover*, 96 Mo. 401; *Priest v. Way*, 87 Mo. 32, Judge SHERWOOD's dissenting opinion and authorities there cited; *Pomeroy v. Benton*, 77 Mo. 82; *State v. Able*, 65 Mo. 357, 371; *State v. Glahn*, 97 Mo. 679, 694. (6) There is no estoppel *in pais* in this case, and appellant should not be heard on this issue at this date. *First.* There is no evidence whatever to base an estoppel on. Both parties had equal means of knowledge. *Second.* The issue was not raised, either in the pleadings by instruction or otherwise at the trial of the cause. It must be pleaded in the answer. 1 Greenleaf on Evidence, secs. 22, 23; *St. Louis v. Lumber Co.*, 98 Mo. 613, 617; *Prior v. Lambeth*, 78 Mo. 538, 546; *Kincaid v. Dormey*, 51 Mo. 552; *Bales v. Perry*, 51 Mo. 449, 452; *State v. Laies*, 52 Mo. 396.

BLACK, J.—This is an action of ejectment for sixteen and ninety-five hundredths acres of land in section 31, township 46 north, range 1 east, of the fifth principal meridian in St. Charles county. The controversy arises out of a difference as to the true line dividing the north half and the south half of that section.

Earnest Goltermann obtained two patents from the United States dated in 1835 and 1837. In one, the land conveyed is described as lot 2 of the northwest quarter

Goltermann v. Schiermeyer.

of said section, containing one hundred and three and twenty-seven hundredths acres "according to the official plat of the survey of said land, returned to the general land-office by the surveyor general;" and in the other, the land is described as lot 1 in the northwest quarter and the west half of the northeast quarter of said section, containing one hundred and sixty acres, with a like recital as to the official plat. Goltermann died in 1852, leaving the plaintiff as one of his heirs. Plaintiff acquired the interest of the other heirs in the land, except a part north of the line in dispute. He also put in evidence a survey made by county surveyor Jenkins, pending this suit, and a copy of the plat of the entire township as returned by the surveyor general.

Sec. 31, Twp. 46 N., Range 1 E.

The annexed diagram represents section 31 as it appears on this government plat.

The evidence for defendant shows that the south half of the section was set apart to the state as school lands. In 1847 it was surveyed and laid off into quarter quarter sections under an order of the county court of St. Charles county, by Judge Krekel, then county surveyor. The three school quarter quarter sections adjoining the land now owned by the plaintiff were sold, one to Heindis and the other two to Knippenberg. Heindis conveyed his tract to Knippenberg in 1848, and the latter conveyed the three tracts to defendant Schiermeyer in 1866. The defendant put in evidence this title, the Krekel survey, and various other surveys made by county surveyors.

Krekel, in making his survey in 1847, found the quarter section corner on the east section line to be forty-three and twenty-hundredths chains from the southeast section corner, thus making an excess of three and twenty-hundredths chains over the government survey. From that quarter section corner he ran a line west parallel to the south section line and planted a corner on the west section line. Jenkins, in making his survey, measured the distance between the west section corners, making it eighty-five and fifty-four and one-half hundredths chains instead of eighty-five and fifty-hundredths chains, as laid down on the government plat. He divided the excess of four and one-half links, making the west line of the southwest quarter forty and two-hundredths chains, and the west line of the northwest quarter forty-five and fifty-two and one-half hundredths chains. From the point thus obtained he ran a straight line to the government quarter section corner on the east section line. The difference between the two surveys is a strip of land four and thirty-eight-hundredths chains wide on the

west section line, running east three-quarters of a mile to a width of one and six-hundredths chains, being the land in suit.

1.   As the United States sold the north half of the section, and set off to the state for schools the south half by reference to the survey returned by the surveyor general, it is perfectly obvious that the section must be divided according to that plat and the acts of congress relating to the survey of the public domain. Section 7398, 2 Revised Statutes, 1879, of this state has nothing to do with this controversy.

2.   The patents from the United States to Goltermann all refer to the official plat of the survey returned by the surveyor general to the general land-office for a description of the land granted.   The land having been granted according to the plat, the plat and the figures and marks thereon designating the corners became a part of the grant the same as if the descriptive features represented by them had been written out in full in the patents.   In short the plat with all of its marks and figures and the field notes became a part of the patent for all purposes of identifying the land granted.   *Cragin v. Powell*, 128 U. S. 691.

But it is here insisted that the figures "40.00" representing the length of the west line of the southwest quarter, and the figures "45.50" representing the length of the west line of the northwest quarter are no part of the plat.   These figures, as they appear on the plat, are in red ink showing that they do not represent distances actually measured in the field.   It is, therefore, insisted that they were placed on the plat without authority of law, and should be rejected and disregarded.

The acts of congress of May 10, 1800, and February 11, 1805, are carried into the Revised Statutes of

the United States [2 Ed. 1878], to which reference is made.

Section 2396 provides, among other things: *"First.* All the corners marked in the surveys, returned by the surveyor general, shall be established as the proper corners of sections, or subdivisions of sections which they were intended to designate; and the corners of half and quarter sections, not marked on the surveys, shall be placed as nearly as possible equidistant from two corners which stand on the same line."

The claim is that the words "marked in the surveys returned" mean corners actually established on the ground. We think the words have a much broader meaning. This will be the more apparent by referring to some of the duties of the surveyor general in respect of sections on the west township line as is this section 31. Section 2395 provides that, where townships which are subdivided exceed or do not extend six miles, the excess or deficiency shall be *specially noted,* and added to or deducted from the western and northern ranges of sections or half sections; and that these irregular sections and half sections shall be sold as containing only the quantity expressed in the returns and plats, and all others as containing the legal quantity. It is, therefore, the duty of the surveyor, not only to note this excess or deficiency, but to calculate the contents of these irregular subdivisions, and to note the quantity on the surveys returned. Hence, it is clear that the "surveys returned" properly show more than mere lines actually run and corners planted.

If it is his duty to calculate the areas and state the result on the plat, it is certainly competent for him to note the basis upon which he made the calculation, and especially so since the irregular subdivisions of the sections lying in the northern and western ranges of section must be sold as containing the quantity

expressed on the plat. The statutes are general in their terms and many things are left to the direction of the surveyor general and the land department. We entertain no doubt but the surveyor general had full power and authority by himself or deputies to designate these distances on the plat.

But for the purposes of this case, and no other, let it be assumed that these figures should have been omitted from the plat, still it does not follow that the courts can undo what the surveyor general and his deputies have done. He by himself or subordinates fixed this quarter section corner on the plat by stating its distance from the section corners, and the government accepted the plat and sold the land pursuant thereto. By these acts the government through its political department adopted the plat and all the marks and figures thereon. If this plat was incorrect it was for the land department to reject it. That department had the power to accept or reject it. It did accept the plat, and that act is not reviewable by the courts. The government having accepted the plat and sold the land pursuant to it, the courts have nothing to do but ascertain its meaning and give effect to that meaning.

It follows from what has been said that we are to take this plat, with the figures thereon, and read it as part of the patent. Guided by the plat there is no difficulty whatever in finding the principle upon which this dividing line should be run. By reference to the diagram it will be seen that in running the north section line west through to the township line it fell five and fifty-hundredths chains north of the mile monument set in the township line. The west section line is, therefore, eighty-five and fifty-hundredths chains in length. The plat also makes the west line of the southwest quarter forty chains and the

west line of the northwest quarter forty-five and fifty-hundredths chains. If, as in this case, an accurate measurement shows that the section line exceeds eighty-five and fifty-hundreths chains, then the excess must be divided between the quarter section lines in the proportion of the length of those lines as stated on the plat. The point thus ascertained is the true quarter section corner, and a straight line from that point to the east quarter section corner is the true dividing line.

The monuments set by the deputy United States surveyor for the west section corners must control as to the proper location of those corners. The question where they were located, if destroyed, is one of fact, and not of law, for the jury to determine under all the evidence. *Jacobs v. Moseley*, 91 Mo. 457. In view of what was said on the argument of this case, it may be observed that the second paragraph of section 2396, so far as it speaks of fractional townships, has nothing to do with this case. It does not make a township fractional, because in laying it off into sections there is an excess or deficiency to be carried into the western and northern ranges of half and quarter sections. Townships are fractional when the outer boundary lines cannot be carried out in full, because of a watercourse, Indian boundary or some other external interference.

It is not to be inferred that a different conclusion would have been reached had the length of these quarter section lines been omitted; for force and effect must be given to the fifth paragraph of section 2395 in locating these blank quarter section corners, the areas being given. The equidistant rule can be applied to those cases which the law does not point out as exceptional. The trial court instructed as to the dividing line according to the principle which we have asserted, and there is, therefore, no error in this branch of the case.

3. With this result it becomes necessary to examine the rulings concerning the other defenses, namely, the statute of limitations, and an agreed line. As before stated, Krekel made his survey in 1847. Earnest Goltermann, the plaintiff's father, resided on his land bounded by the disputed line at that time. He was present when that survey was made, and marked out, and he knew where it placed the line. A brother of the plaintiff testified that, in the spring of 1852, his father desired to fence in part of the land, and with that end in view sent for Knippenberg; that he, his father and Knippenberg went to the west end of the Krekel line and then followed it east to the east side of their lands; that they then set stakes west from that point fifteen feet north of and parallel to the Krekel line for a quarter of a mile; and that his father then built a fence on the line so staked out, leaving the fifteen feet for a private road. The plaintiff extended this fence through westward some twenty years before the commencement of this suit. The other evidence shows that Knippenberg built a quarter of a mile of fence on the west end of the disputed line in 1857 or 1858. In 1871 or 1872, defendant, then the owner of the land, extended this fence east a quarter of a mile, and in 1880 or 1882 he extended it through to the east line. These fences built by defendant and his grantor were placed on the Krekel line and have always remained on that line. The defendant, from time to time, cut timber from that part of his land, not fenced prior to 1880. He and the plaintiff always understood the Krekel line to be the true one until 1886, when a new survey disclosed the error. This suit was commenced in 1887. From this statement it will be seen that defendant, by himself and grantor, has had possession of about one-third of the land in suit for thirty years, that he has had

another third inclosed for fourteen or fifteen years, and the residue for five or six years.

There is a common error running through nearly all of the instructions given at the request of the plaintiff on the subject of adverse possession. It will be sufficient to set out the ninth, which is in these words: "The jurors are further instructed that possession up to what is erroneously supposed to be the true line, with no intent to claim beyond the true line, does not bind either party when the true line is ascertained, no matter how long such possession has continued, and the statute of limitations does not apply to such a case; and even though the jurors may find that the defendant and those under whom he claims went beyond the true line and took and held possession of a part of the plaintiff's land for ten consecutive years or more, in ignorance of the true line and with no intent to claim beyond the true line, yet they must find for the plaintiff, unless it has been shown from the evidence that there was an agreed line, under the instructions as to an agreed line."

Where one of two adjoining land proprietors builds a fence upon what he supposes is the true line, and takes possession of the land so inclosed, without claiming or intending to claim beyond the true line when subsequently ascertained, his possession of a part of his neighbor's land included in the inclosure is not adverse. *Schad v. Sharp*, 95 Mo. 574, and cases cited. But, on the other hand, where one of two adjoining land proprietors takes and holds possession up to a fence which he supposes is on the true line claiming to the fence, his possession is adverse as to all the land within his inclosure. In such case it makes no difference that he was mistaken as to the location of the true line; nor does it make any difference that he did not intend to invade his neighbor's rights. The fact that

he claimed to the fence, not simply to the true line when ascertained, is sufficient and will constitute a disseizin. *Cole v. Parker*, 70 Mo. 377; *Handlan v. McManus*, 100 Mo. 125; *Battner v. Baker*, 108 Mo. 311.

This court, speaking through Judge BLISS, said: "It is not uncommon for adjoining proprietors, in making their division fences, to mistake the true line of division. Sometimes they intend to make the line of the fence the actual boundary of their separate property, claiming and occupying up to it as the individual property of each, and each understanding the character of the claim and occupancy of the other; but sometimes, also, they make the fence as a division of convenience, mistaking or ignoring the true line; or one of them may make it as part of a necessary inclosure, without intending to claim beyond the true line. In the one case, the occupancy would be adverse; in the other, it would not. *Thomas v. Babb*, 45 Mo. 384.

The defendant has been in the actual possession of more than two-thirds of the land in suit for much more than ten years before the institution of this suit. He built the fences on what he and the plaintiff and their respective grantors believed to be the true line, that is to say, the Krekel survey. The facts as far as they have been stated show that he claimed to the fence, and they negative in strong terms the notion that he only claimed to the true line wherever it should turn out to be. The only other evidence that can be claimed to furnish a basis for instructions on the theory that he claimed only to the true line is in substance this: A witness who was present at a survey made less than a year before this suit was commenced testified that on that occasion defendant said if the line was right, pointing to the fence, he wanted it to stay there, that he did not want the plaintiff's land; he wanted the school land. Another witness gave evidence to the

same effect. The court stenographer says that on the former trial the defendant testified that he did not intend to take or hold possession of any land that his deeds did not describe. While this evidence tends to show that defendant did not seek to obtain land not his own, it does not in the least shake the other evidence to the effect that he, at all times, claimed up to the fence. This was his steady claim for thirty years, and this being so it is immaterial that he did not seek to acquire title to his neighbor's land. Any other rule would place the honest occupant at a disadvantage.

There is, in our opinion, no evidence in this case calling for any instructions based on the theory that defendant only claimed to the true line when ascertained. The trial court should have refused all of the instructions based on that theory of fact. Plaintiff's sixteenth instruction was probably given through some mistake, for it is so clearly erroneous as to call for no discussion.

4. Some questions remain concerning the east end of the land in question which defendant fenced in only five or six years before the institution of this suit. He claims to have color of title to this parcel. The patent from the state to Heindis simply states that it appears from an abstract of sale of school lands in St. Charles county that Heindis became the purchaser of the northwest quarter of the southeast quarter of section 31, etc., containing forty-three and twenty-hundredths acres, and then follows the granting clause. The abstract mentioned in the patent is not in this record. Indeed, there is nothing in the patent or record before us to show that the state conveyed the lands according to the Krekel plat. Had the patent referred to that plat we could treat the plat as a part of the patent, but, in the absence of any such recital or reference, we must take the patent to mean and refer to the United States

survey. According to that survey the land in suit is not embraced in the patent, and hence the patent does not constitute color of title; for color of title cannot extend beyond the boundaries specified in the grant. There is nothing in the other deeds under which the defendant claims to enlarge the descriptive words. We think it cannot be said on this record that defendant has color of title to this strip of land. But we do not see that this result materially affects the case. As the plaintiff is the rightful owner of his farm, and is in possession of a part, that possession will draw to him possession of all the land embraced in his muniments of title which is not in the actual exclusive possession of the defendant; and this would be true if defendant had color of title. The defendant, to defeat this action, must, therefore, show actual, exclusive, adverse possession for the period of ten years before the commencement of this suit. *Crispen v. Hannavan*, 50 Mo. 536; Angell on Limitations [6 Ed.] sec. 402; Sedgwick & Wait on Trial of Title to Land [2 Ed.] sec. 753; *Ozark Plateau Land Co. v. Hays*, 105 Mo. 143.

The question then is whether there is evidence here of actual possession of the eastern part of the land in suit. In *Draper v. Shoot*, 25 Mo. 201, it was said: "It is no easy matter to say what is an adverse possession. It is a question compounded of law and fact, and every case in which it is involved must be determined by its own circumstances. What is adverse possession, is one thing in a populous county, another in a sparsely settled one, and still a different thing in a town or village; * * * to constitute an adverse possession there need not be a fence, building or other improvement made; and * * * it suffices for this purpose that visible and notorious acts of ownership are exercised over the premises in controversy for the time limited by the statute; * * * much depends

upon the nature and situation of the property, the uses to which it can be applied, or to which the claimant may choose to apply it." These observations were approved in *Leeper v. Baker*, 68 Mo. 400, where it was again said: "The words 'actual occupancy' are themselves indefinite in their meaning, for although they are usually applied to a case of residence on the land, or to an occupation by fences or buildings, they are not necessarily restricted to such marks of occupation, but may be applied to other acts of ownership which are known to the true owner." See also *Mississippi Co. v. Vowels*, 101 Mo. 225.

Now in this case the plaintiff's father built a fence along this part of the land as far back as 1852, leaving a private roadway between the fence and the Krekel line. For a period of about thirty years plaintiff and his father made no claim to any of the land south of that line. During all that time the defendant claimed the land up to the line as his own, of which claim the plaintiff and his father had full notice and knowledge. Defendant has had this part of the land inclosed for five or six years. It is timber land; some of it, we infer, not adapted to cultivation. During the thirty years the defendant has used it in connection with his farm, cutting timber therefrom for wood, rails and house logs. We think these facts show an exclusive adverse possession for the full period of ten years, and that these facts constitute actual, exclusive possession. There is, therefore, evidence upon which to submit the case to the jury as to this part as well as the other.

5. It will not be necessary to set out the instructions given and refused on the subject of an agreed line, for, in our opinion, there is no evidence to justify any instructions upon that subject. When there is a dispute as to the true division line between adjoining propri-

etors, or the line is uncertain, and they are ignorant as to its true location, and they fix and agree upon a permanent boundary line and take possession accordingly, the agreement is binding on them and those claiming under them, and should be enforced. *Jacobs v. Moseley*, 91 Mo. 457; *Schad v. Sharp*, 95 Mo. 574; *Crawford v. Ahrnes*, 103 Mo. 88.

Here there was no dispute whatever between the parties about the line, nor any uncertainty in their minds as to its true location. They all supposed and believed the Krekel line was the true one, and on that belief they acted. There was nothing to give rise to any agreement. It is true such an agreement may be inferred from circumstances, but the circumstances dispute closed in this case do not even tend to suggest an agreed line. There is no such issue in the case. As to an estoppel, it is sufficient to say that no instructions were asked or given upon that subject, so that there is no such question before us on this record.

Thus far all the judges except Thomas, J., concur. Some of us feel that there is no dispute as to the material facts, that the statute of limitations constitutes a full defense, and we can see no reason why there should be a third trial. Accordingly, Sherwood, C. J., Brace, J., and the writer are of the opinion that the judgment should be reversed, and Thomas, J., concurs in this result; while Barclay, Gantt and Macfarlane, JJ., are of the opinion that the judgment should be reversed and the cause remanded. The judgment is, therefore, simply reversed.

Per Curiam.—On consideration of the motion for a rehearing, Sherwood, C. J., Barclay, Gantt and Macfarlane, JJ., are of the opinion that the cause should be remanded for new trial on the question of fact concerning adverse possession; Sherwood, C. J., being of the opinion that the cause should be remanded

for new trial only as to that part of the strip of land in suit which has not been inclosed by a fence for ten years next before the commencement of this suit. BLACK, BRACE and THOMAS, JJ., adhere to their former opinion that the judgment should be one of reversal only. Accordingly, the judgment of this court reversing the judgment of the circuit court is modified by remanding the cause for further proceedings according to the principles of law laid down in the former opinion. To avoid any misunderstanding we again state, and to this we are all agreed, that there is no evidence upon which to give instructions based upon the theory that defendant claimed title only to the true line wherever that might be when ascertained. As to the extent of his claim, the instruction should proceed on the basis that he does and always has claimed title and ownership up to the Krekel line.