245 S.W.2d 116 (1952)
PATTERSON et ux.
v.
WILMONT.
No. 41990.
Supreme Court of Missouri, Division No. 1.
January 14, 1952.
*117 Dearing & Matthes, J. W. Thurman, and W. Dwight Schubel, all of Hillsboro, for W. H. and M. K. Patterson.
H. L. C. Weier, Festus, for Eva Rocine Wilmont.
CONKLING, Presiding Judge.
The instant difficulty now for attention had its humble origins in an insignificant neighborhood incident wherein one neighbor objected to another using a certain hill road. Full grown, it has all attained no greater stature than a mere boundary line dispute between other neighboring owners of small adjoining tracts of land in the rural hills of Jefferson County, a region where surely there was more hill land than there was amity. After reading the transcript before us it seems that the admonition of The Psalmist, "Behold, how good and how pleasant it is for breathren to dwell together in unity", in at least this instance, went unheeded. Butwhen neighbors become angry with each other, litigation generally results. The land actually involved is but 12 feet wide and only 130 feet long. Its value does not appear, but it could not be much. As observed in the photograph exhibits filed here the terrain is very rough, productive of brush and boulders in great abundance, and the hillside is quite steep. The circuit court adjudicated title to real estate, hence our jurisdiction.
This action began as one in ejectment, and for injunctive relief. The suit was by Wm. H. Patterson and his wife Marion (hereinafter sometimes called plaintiffs) against Eva Rocine Wilmont (hereinafter sometimes called defendant). The land involved is three separate quite small tracts alleged to be in Sulphur Springs, Missouri. The petition is in three counts. Defendant answered and filed a counterclaim in three counts.
Court I of the petition prayed the ejectment of defendant from a certain strip of land therein alleged to be 10 feet wide, and hereinafter referred to as "Tract C". Count III of the counterclaim described this Tract C as 12 feet wide and 130 feet long, claimed title thereto "by limitations under the provisions of" what is now Section 516.010, references are to RSMo 1949, V.A.M.S., unless otherwise specified, and prayed that title to Tract C be quieted in defendant. Upon Count I of the petition the court found against the plaintiff and for the defendant. Upon Count III of the counterclaim the court found for the defendant and against plaintiff, found the tract, the title to which was in issue, was 12 feet wide and 130 feet long, quieted title thereto in the defendant, holding that the "title to said real estate * * * has vested in defendant by limitation under the provisions of Section 1002 of the Revised Statutes of 1939, now Section 516.010, and that the title or claim of the plaintiffs in and to said real estate is by the limitation of said statute barred."
Count II of the petition prayed injunctive relief to restrain defendant from obstructing the use by plaintiffs of an alleged easement in and to a certain described roadway; alleged plaintiffs were entitled to use and had used the roadway more than 10 years; and that defendant was preventing plaintiffs free use thereof. We hereinafter refer to this roadway as "Tract A". As to this Tract A, Count II of the counterclaim alleged defendant was entitled to the possession thereof, that plaintiffs *118 were unlawfully withholding possession to defendant's damage and prayed plaintiffs' ejectment therefrom and damages. Upon Count II of the petition the court found the issues for plaintiffs and against defendant, and upon Count II of the counterclaim the court found for plaintiffs and against defendant, and found plaintiffs entitled to the free use of the roadway and to the enjoyment of their easement, and granted the injunction prayed.
Count III of the petition prayed injunctive relief to restrain defendant from obstructing the use by plaintiffs of their alleged easement in and to another certain described roadway; alleged plaintiffs were entitled to use and had used said roadway more than 10 years; and that defendant had obstructed the roadway and thus prevented plaintiffs' use thereof. We hereinafter refer to this as "Tract B". Count I of the counterclaim alleged defendant was entitled to possession of Tract B and prayed the ejectment of plaintiffs therefrom, and damages. Upon Count III of the petition the court found the issues for plaintiffs and against defendant; and upon Count I of the counterclaim the court found the issues for plaintiffs and against defendant, and found plaintiffs were entitled to the free use of the roadway and to the enjoyment of their easement, and granted the injunction prayed.
The cause was tried without a jury. Both the plaintiffs and the defendant have appealed from the trial court's decree.
The plaintiffs won below as to Counts II and III of their petition. As to the assigned error of the court below in ruling Count I of their petition (Tract C, supra) plaintiffs contend here that (1) there is not sufficient substantial evidence in the record to warrant or support the decree entered, (2) there is no evidence that defendant's possession was actual, notorious, continuous and so hostile as to constitute "an unequivocal claim of ownership for the statutory period", and (3) there being no proof as to "claim of ownership" defendant cannot acquire title by adverse possession.
The defendant lost below upon Counts II and III of the petition, and was denied the relief prayed in Counts I and II of her counterclaim. As to those portions of the decree of the trial court adverse to defendant and ruling Count III of the petition and Count I of the counterclaim (Tract B), defendant's brief does not even approach the specification of a single allegation of error. Certain of the purported Points and Authorities in defendant's brief purport to discuss only claimed phases of the evidence; some state a purported abstract proposition of law; one purports to mention "a twelve foot strip of land" without further identifying it or assigning error; one mentions whether a certain witness intended to claim "beyond the true boundary line", without identifying the tract of land or the boundary line of which counsel was there writing, and without assigning error; and others abstractly and indiscriminately purport to loosely mention alleyways, easements, roads, witnesses, ten year periods of limitation, etc., and what not, but assign no error. It is stated in defendant's purported Points and Authorities that "The judgment establishing the roadway designated "A" on plaintiffs' Exhibit I is erroneous for the reason that the description of said roadway does not conform to the pleadings and the evidence * * * (and) is void for uncertainty of description." We will accept that last above quoted as an allegation of error, as required by our Rule 1.08(3) and confine our consideration to that one point of defendant's appeal.
But the difficulty apparently experienced by some of the bar in complying with a rule as clearly written and as free from ambiguity, as is Rule 1.08, is not readily understandable. We dislike to believe that those who fail to comply with this rule fail to do so because of indifference or carelessness. But would not any other conclusion be a reflection upon counsel who fail to comply? The lack of page references to the transcript in statements and in printed argument in briefs is astoundingly increasing. Since the adoption of the new Code almost no cases have been dismissed *119 in our appellate courts upon what were once classified as technicalities. Formerly many appeals were dismissed for failure to comply with rules. Perhaps some should now be. Of a somewhat similar situation, and in applying the penalty, this court once observed: "If learned counsel had paid attention to the rules of court in the logical arrangement and segregation of his legal propositions, * * * his case would be in a shape contemplated by the rules, but, as it is, his case is here in the teeth of them. The rules of appellate practice in hand are simple and plain. They fill no office of mere red tape, or as a show of surface routine. To the contrary, they have substance, and carry on their face the obvious purpose to aid appellate courts in getting at the right of a cause. Hence, apparently, they bespeak the dignity arising from obedience. If they are not to be obeyed, they should be done away with once for all. A just rule, fairly interpreted and enforced, wrongs no man." Sullivan v. Holbrook, 211 Mo. 99, 109 S.W. 668, 670.
These facts appear of record. On May 8, 1939, plaintiff William H. Patterson acquired from Isabelle Dobler, who had owned it since 1920, a certain ten-acre tract of land in Bradford's First Addition to Sulphur Springs, lying east of U. S. Highway 61 and in the neighborhood of Barnhardt, Missouri. In July, 1943, defendant acquired from Evelyn Fitch, who had owned it since 1932, a certain tract of land (upon which there was a house near the east line thereof) and which tract was 130 feet north and south by 100 feet east and west, and which tract lay immediately west of and abutted 130 feet along the west line of plaintiffs' above ten acres. Defendant's east line abutted upon a part of plaintiffs' west line. It is the boundary line between these two properties that is here in dispute.
Patterson testified that when he purchased his ten acres in 1939, there was a fence along what he was told was his west line; that part of that fence was "within three or four feet" of, and just east of, the house purchased by defendant in 1943; that when defendant purchased her property in 1943 "the fence was so near the (defendant's) house there was just a pathway around and difficult for them (defendant) to use the east part of their property"; that "shortly after they (defendant) bought the house", Patterson talked to defendant and her husband at defendant's house; that they then asked Patterson if he would sell them a strip of his land 12 or 15 feet wide along their east line; that Patterson declined to do so; that defendants then said: "Will you let us move the fence so we can park our car and get around the house"; that Patterson thereupon replied, "No, I have no objection to that. It is still understood I own the property, but I will be a good neighbor and let you move the fence"; that defendant then moved the fence along by her tract to a point about 12 feet east of the old fence line; that thereafter defendant built a retaining wall along the line of that new fence, used the 12-foot strip, and, in 1948, built an outdoor toilet and a septic tank thereon; that he (Patterson) always claimed to the old fence line, about 3 feet from defendant's house; and that the original fence line along plaintiffs' west line was a straight line, but there now is a 12-foot offset therein abutting defendant's 130-foot east line.
Patterson's predecessor in title, Isabelle Dobler, testified that when she acquired what is now the Patterson property in 1920 the house defendant now owns was on what is now defendant's tract and in its present location; that there was then a fence around that house; that the east fence line of that property (the west fence of the then Dobler property) was "about 2½ to 3 feet" east of what is now defendant's house; that while she, Dobler, owned the Patterson ten acres (and about 1925) she rebuilt the fence in question, "the width of an automobile" further east, so they (the Steins who then lived there) "might have a little roadway * * * with the understanding it was still my property"; and that she "at all times claimed the land up to" the original fence 2½ or 3 feet from what is now defendant's house.
Defendant testified that when she purchased and moved into her property in 1943 "the fence was as it is now" (12 or 15 feet *120 east of her house); that the east fence had never been moved to her knowledge; that there was no conversation with plaintiff Patterson wherein she or her husband asked and secured permission from plaintiff to move the fence, but on cross-examination she said Patterson was talking to her husband, and that she was "in the house and wasn't paying much attention"; that ever since she moved there in July, 1943 she had used and improved the 12 or 15-foot strip of land, leveled it down, parked cars thereon, drove cars over it, and in 1946 built a septic tank and an outhouse on it, and built a rock retaining wall on the fence line. Defendant identified the many photographs introduced, some having been taken as early as 1945, and showing the fence "11 or 12 feet from the house * * * as it existed when we first moved there".
Defendant's predecessor in title, Miss Fitch, testified that when she owned the property there were two north and south fences east of the house, first, " * * * a very low fence * * * extraordinarily low * * * if you opened that (east door of the house) you pretty nearly had to step on that fence * * * that was a low fence, just supported by a few two by fours. There was another fence * * * the width of a driveway further east * * * I was told it was ordinary fence line and was built with good posts, short distances apart, two by fours or wider. I can't tell you what kind of wire that was". She further testified, "I thought it (her east line) included the driveway"; that the east fence "went straight apparently to the back end of the lot * * * that fence was there and looked as though it was well established and had been there quite a while and it was the length of a driveway"; that she used it for and as "a driveway".
Miss Fitch also testified:
"Q. I want to know where you claim your line was? A. I didn't claim. I took it as it was given to me.
"Q. On the abstract? A. No, the described fence. I didn't investigate it further. I personally never established a line if that is what you mean.
"Q. I want to know where you thought your east line was? A. I thought it included the driveway.
"Q. You were claiming over to the wider fence or higher fence? A. Yes, sir. The people from whom I got it kept chickens, lots of chickens. I just took it they had that (the low fence) to fence in some of those chickens."
She also testified that, "I will say from the looks of it that little, low fence was not to be the line fence. The other one did appear to be.
"Q. You never openly or any other way claimed the easternmost fence was the east line of your property? A. No, I never made any determination of that. I don't know why they could not survey it. * * *
"Q. You claimed up to the large fence as being your property line? A. I don't know what that means by claiming. I just took it for granted it went to that fence. That was beyond a driveway that belonged to the property. I just supposed, of course, it went out to the fence in the driveway. * * *
"Q. Did anyone ever tell you to get off of that intervening piece of land between the fences, that driveway? A. No, no indeed, no one ever did. * * *
"Q. You never intended to claim any property not described in your deed? A. No, I never intended to claim anything that wasn't mine."
In all twenty-two witnesses testified. A great many photographic exhibits, plats, drawings, documents, letters, etc., were introduced in evidence and are filed here. With care and patience we have read, digested and analyzed the testimony. Much of it is laboriously cumulative. We have studied and with difficulty have correlated the documentary evidence to the mass of oral testimony. Many of the witnesses had lived for varying short intervals of time in the Wilmont house. Others were neighbors and lived nearby. Some had regularly delivered various things to those who lived in the Wilmont house. One witness had twice within 20 years rebuilt the line fence just east of the so-called driveway, *121 had then measured its distance east from the Wilmont house and testified such distance was about 12 feet. Some of the witnesses testified they remembered brokendown remains of a low fence near and east of the house. And,as a learned judge of this court in an opinion once observed rather parenthetically, but certainly historically and prophetically: " * * * a low or broken line fence [is] the devil's own invention for discords and squabbles between coterminous proprietorsa fecund womb of a miserable brood of infelicities, viz., bad blood, bickering, bloodshed, fuss, litigation". Sanford v. Kern, 223 Mo. 616, 122 S.W. 1051, 1055.
Limitations upon space forbid further detail of the mass of testimony the trial court heard. While there is some testimony to the contrary, as a whole the testimony seems to overwhelmingly establish (and the trial judge had a right to so conclude, and obviously did so conclude) that there was but one line fence which was about twelve feet east of the Wilmont house, and that such condition had existed for many more than the ten years of limitation mentioned in Section 516.010.
The contentions of plaintiffs upon their appeal must be ruled under our well settled principles of adverse possession. Defendant had not owned the property for the ten year statutory period and relies upon her predecessor in title to establish defendant's rights in this connection. See Section 516.010. Plaintiffs rely heavily upon and argue that the testimony of Miss Fitch destroys defendant's right to have title adjudged in defendant under the rules of adverse possession. Because of such contention by plaintiffs we have particularly noticed above the testimony given by Miss Fitch. Plaintiffs' first brief thus asserts their position: "There is not a scintilla of evidence that either defendant or any of her predecessors in title made a claim sufficiently broad to include all the elements required to ripen a title by adverse possession. * * * The mere showing of possession alone is not sufficient to call into play the rule now under discussion; the very basis of a title by limitation is a claim of ownership for the statutory period. We submit that there is no evidence in this record where defendant or her predecessor in title ever made a claim of ownership for the statutory period of ten years". (Emphasis is plaintiffs'.) Plaintiffs' reply brief re-asserts the above, elaborates thereon and states that to prevail, defendant had to prove her "actual, notorious and continuous possession of the premises and under an unequivocal claim of ownership for the statutory period", etc. (Again the emphasis is plaintiffs'.)
We examine to see what this court has heretofore ruled with respect to what constitutes an unequivocal claim of ownership. The question is not new. In Landers v. Thompson, 356 Mo. 1169, 205 S.W.2d 544, 545 (cited here by both parties), Judge Hyde, writing the opinion for this Court, said: "Even if the fence was not on the true line and that fact was unknown to the owners of the west eighty, nevertheless a hostile claim could be made by one who believed himself to be the owner of the land which he was claiming. Walbrunn v. Ballen, 68 Mo. 164; Cole v. Parker, 70 Mo. 372; Goltermann v. Schiermeyer, 111 Mo. 404, 19 S.W. 484 [20 S.W. 161]; Courtner v. Putnam, 325 Mo. 924, 30 S.W.2d 126; Brown v. Wilson, 348 Mo. 658, 155 S.W.2d 176. `The principle, as stated in all of our prior decisions, may be reduced to this: If the possessor occupies the land in question intending to occupy that particular piece as his own, his occupancy is adverse. It is not necessary that he intend to take away from the true owner something which he knows belongs to another, or even that he be indifferent as to the facts of the legal title. It is the intent to possess, and not the intent to take irrespective of his right, which governs.' State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W.2d 174, 176. Thus it is not necessary that the true boundary line be known before an unequivocal claim can be made to ownership of land beyond that line."
And in State ex rel. Edie v. Shain, supra [348 Mo. 119, 152 S.W.2d 177.] (cited here by both parties), we further stated the above principle in these words: "Possession *122 is a legal concept. It involves two things: a present or, in the case of constructive possession, a past ability to control the thing possessed plus an intent to exclude others from such control. Or, in the language sometimes used in the cases, to exercise dominion over the object possessed. One may have such an intent in the case of property actually belonging to another, because he intentionally wants to take it away from the owner. But he may also have this intent because he is mistaken as to the facts of legal ownership. Respondents' opinion recognizes this rule as laid down in our prior controlling cases, and holds that the intent to possess can and should be inferred from the fact that improvements of a permanent nature were placed upon the land in controversy. Such a holding is entirely consistent with the evidence in this case and in no wise contradicts our prior controlling decisions."
When the rule above quoted is applied to the instant facts we are compelled to conclude that the trial court did not err in ruling Count I of the petition and Count III of the counterclaim, and in concluding that under Section 516.010 defendant acquired title to the land in question under the applicable principles of adverse possession. Here there was evidence from which the trial court could, and obviously did, find that the defendant and her predecessor in title were in the actual, notorious, open, hostile and continuous possession of the land under a claim of ownership for more than the statutory period of ten years; and that during such time they exercised the entire dominion thereover, controlled it with an apparent intent to exclude others from control, used it and improved it, and believing themselves to be the true owners of it, intended to and did occupy, use, and possess it as their own. "A claim of right in essence rests in intent." Such intent and possession is fairly inferable from the instant facts. In their dominion over it and in the continued daily use and improvement of this strip up to the fence east of the driveway, the trial court could well find that defendant and her predecessor in title openly planted themselves "under the folds of the flag of hostile possession" and that by such open and unequivocal acts, they claimed to hold and in fact possessed and held that strip as their own.
The case was tried by the court without a jury, there was ample evidence to support the findings of the court below and we may not set its judgment aside unless it was clearly erroneous. We do not find it erroneous. Under these circumstances we have due regard to the opportunity the trial court had to determine the credibility of the witnesses. Section 510.310, Cosentino v. Heffelfinger, 360 Mo. 535, 229 S.W.2d 546, Gabel-Lockhart Co. v. Gabel, 360 Mo. 518, 229 S.W.2d 539. Under the reasoning of Landers v. Thompson, supra, and cases therein cited, the fact that Miss Fitch, of course, did not intend "to claim anything that wasn't mine", or did not intend to take away from any true owner something which she knew belonged to such other true owner, is not determinative. Upon the above-quoted evidence the trial court would not have been justified in finding that defendant and Miss Fitch claimed only to the smaller broken down fence near the house irrespective of the larger substantial fence further east, even if we assume the small broken down fence was on the true line. See also, Finck Realty Co. v. Lefler, Mo.Sup., 208 S.W.2d 213, 215, 2 C.J.S., Adverse Possession, § 84(3) and cases there cited, and 11 C.J.S., Boundries, § 79. Other above stated factors clearly appear which, under our above adjudications, make the possession of Miss Fitch and of defendant of Tract "C" so hostile as to constitute an unequivocal claim of ownership.
We come now to defendant's assignment of error upon her appeal that the judgment below, on Count II of the petition and Count II of the counterclaim "establishing the roadway is erroneous", because the description of the "roadway" does not conform to the pleadings and the evidence and is void for uncertainty of description.
It may be first observed that the judgment of the court does not purport to "establish" any roadway. The issues made by *123 Count II of the petition and Count II of the counterclaim are simple. The petition prayed injunctive relief to prevent defendant's interference with plaintiffs' passage over and use of a certain described road (if it may be dignified by such a term) which plaintiffs had to use to get from Highway 61 into their home on their ten acres, and, which the petition alleges and which defendant in her testimony admitted she had obstructed notwithstanding plaintiffs had an easement to use it. Count II of the counterclaim alleged as to that Tract A (or roadway as it is dignified in the pleadings, but from the photograph it seems to appear more like a trail leading up into the hills) that defendant was entitled to possession; that "plaintiffs unlawfully withhold the possession" to defendant's damage of $200 and $10 monthly rents and profits.
With judicial calmness the trial court heard testimony in this case for three days. Much of it concerned Counts II and III of the petition about the obstruction of these so-called "roadways", the right of plaintiffs to use them, defendant's efforts to prevent plaintiffs' use of them, and the tiring, and almost unending "excuses" therefor, together with much irrelevant background trivia that inevitably will creep into the courtroom trial of a neighborhood quarrel. There were no surveys available although a former county surveyor was a witness. Rough plats, not drawn to scale but showing the two so-called connecting roadways (designated as Tract A and Tract B) and also designating the subject-matter of Count I of the petition as Tract C, were in use in the examination of the witnesses on the trial. Plaintiff Patterson had only one possible route in from the highway to his home. He had expended considerable money in the improvement of that roadway. At two different places defendant sought to prevent plaintiffs from using their only available way in from the highway.
After hearing all the mass of testimony upon these injunction issues the lower court was justified in finding upon both of them for the plaintiffs. The judgment ordered that defendant "is hereby perpetually enjoined from restricting or obstructing the free use of the roadway described in Count II of plaintiffs' first amended petition and which is hereinabove more fully described"; and entered the same judgment as to the other piece of "roadway" referred to in Count III of the petition. The judgment of the court further ordered "that the defendant shall remove the obstruction placed by her in and upon the roadway described in Counts II and III of plaintiffs' first amended petition", etc. We have compared the descriptions (as set out in the petition, counterclaim and judgment) of the so-called roadways with some of the plats used on the trial which were identified as correct copies of the plats of "W. E. Hoover's Sulphur Heights Subdivision" and "Bradford's First Addition to Sulphur Springs, Jefferson County, Missouri", as the same were recorded in the Recorder's Office in that county, and with other evidence; and we find no errors therein.
If there were such, it could not and would not constitute reversible error in these circumstances. It could in nowise have materially affected the merits of the action. Section 512.160(2). Defendant knew what the trial court restrained her from doing, and knew the particular part of the road she was restrained from obstructing. She and her counsel knew from what portions of the "road" the judgment ordered defendant to "remove the obstructions placed by her". They clearly understood what issues were tried and what issues were determined by the judgment. All of that clearly appears from the transcript. And under such circumstances a mere misdescription (which does not here exist) could not have materially affected the merits of the action. Fenton v. Thompson, 352 Mo. 199, 176 S.W.2d 456.
It has been truly said that it is to the interest of the state that litigation come to a some time end. Surely that can be no less true where the litigation is between neighbors.
The judgment of the circuit court is in all things affirmed.
All concur.