## J. H. COLEMAN v. ALFRED SMITH.

(Case No. 2652.)

1. MISTAKE.— It is not competent to prove by a witness a clerical mistake, apparent on the face of field notes of a survey which are offered in evidence; if such a mistake really exists, the jury must determine its existence from an inspection of the paper.

2. DECLARATIONS.— The declarations of a commissioner, who acted as such in making partition of land, may, after his death, be given in evidence, in regard to the location on the ground of a line established by him in making such partition.

3. MISTAKE — IMPEACHING WITNESS.— The transcript of the record of case, containing what purports to be a copy of the depositions of a witness, is not admissible to prove that the witness was mistaken in saying that he never testified in said cause. It could be shown only by the production of the depositions, proof of his handwriting thereto, or by some one who knew the facts.

4. AGREED LINES OF SURVEYS — SURVEYS — BOUNDARY — STATUTE OF FRAUDS.— When the lines of a survey have become of doubtful identity, and the parties to be affected by them have mutually agreed to establish them, and have fixed their bounds on the lines thus established, such agreement must be held conclusive, and not subject to be set aside or reopened upon any subsequent discovery that a mistake was made in that agreement as to the true locality of the lines; and this though the period of acquiescence in such agreed boundary has not been long enough to confer rights by limitation. Such an agreement is not within the statute of frauds.

5. FACT CASE — BOUNDARY.— See opinion for facts held sufficient to sustain a verdict in favor of an agreed boundary line.

APPEAL from Travis. Tried below before the Hon. J. P. Richardson.

This suit was brought by Coleman to recover of Smith a tract of one hundred and two acres of the Burleson league. The tract is described accurately by metes and bounds. The petition is in the ordinary form in trespass to try title, and concludes also with a prayer for an order of survey of the land, that the lines may be plainly marked and corners established, and for general relief. In effect, the suit was one to establish the boundary line between the plaintiff and defendant.

The order of survey was granted, and the survey made by Campbell, the county surveyor, and returned and filed.

The defendant answered not guilty. He set out in his answer that he was the owner of a tract of one hundred and two acres, adjoining and immediately north of the land described in the plaintiff's petition; that one Wm. Black, who, in 1871, owned the tract claimed now by plaintiff, made an agreement with defendant for settling their division line, to procure a surveyor, who should run the line between them, and that the line so run should be the true line of division; that the line was run by Campbell in pursuance of this agreement, and was then agreed to and acquiesced in, the parties moving their fences and inclosures to conform thereto; that Coleman bought the land from Black and claims under him, and had full knowledge of these facts, and had the line so established pointed out to him before he purchased.

The plaintiff replied, admitting the ownership by the defendant of the adjoining land, but denying the agreement to abide by the line to be run by the surveyor, Campbell, and alleged that Smith fraudulently concealed from Campbell the location of the true line, which he knew; and that if Campbell ever established any line between Black and Smith, he was misled by Smith and deceived, and caused to run a different line from the true one.

The case was submitted to a jury, who found for the defendant.

*F. W. Chandler* and *James B. Morris*, for appellant, argued at length that the facts were not sufficient to sustain the verdict, and cited as authority for their position against the conclusiveness of the agreed line, 2 Overton, 304; Newson v. Prior, 7 Wheat., 7; 13 Pick., 267; 12 Mass., 469; Bolton v. Lann, 16 Tex., 96; Bragg v. Lock-

hart, 11 Tex., 163; Mitchell *v.* Burdett, 22 Tex., 634; Story's Eq., sec. 151; Floyd *v.* Rice, 28 Tex., 343; McArthur *v.* Henry, 35 Tex., 801; New Orleans *v.* United States, 10 Pet., 734; Lewis *v.* San Antonio, 7 Tex., 319; Kerr on Fraud and Mistake, p. 433.

*Sheeks & Sneed,* for appellee, relied on Brown *v.* Caldwell, 10 S. & R., 114; George *v.* Thomas, Smith *v.* Russell, 37 Tex., 256; Houston *v.* Sneed, 15 Tex., 307; Hoxey *v.* Clay, 20 Tex., 582; Bolton *v.* Lann, 16 Tex., 112; Stroud *v.* Springfield, 28 Tex., 665; Welder *v.* Carroll, 29 Tex., 332; Smith *v.* Russell, 37 Tex., 255.

Quinan, J. Com. App.—The assignment of errors assigns many errors as committed upon the trial, but in a way so indefinite and uncertain as for the most part to obviate the necessity of any special consideration of them on our part. We shall discuss those only which the appellant relies upon in the briefs of his counsel.

The points made in the briefs are:

1. That the court erred in the admission of testimony and in the rejection of testimony, as shown by three bills of exception.

2. That the court erred in giving and refusing charges asked.

3. That the evidence does not sustain the verdict and judgment.

The plaintiff's first bill of exceptions shows by the statement of the judge that plaintiff offered to prove by a witness, that, upon certain field notes offered in testimony, there was a mistake apparent upon the face of them; and the judge ruled that the witness should not state to the jury that it appeared by the field notes that there was a mistake in them, because, if the mistake is manifest on the field notes, the field notes themselves are the best evidence of the fact; the court did not rule that

the plaintiff could not prove the mistake by any evidence. This ruling of the judge was manifestly correct. The assumed error was, that the plat showed the width of lot No. 1 at its west end was intended to be 415 varas wide, and that the call in the field notes for said line to be 1,250 varas long, not 415, was a clerical mistake. If this were so, the exhibition of the plat and field notes was evidence of it, and it was the business of the jury to determine the fact. It needed the oath of no witness to draw for them the proper deduction to be drawn from the testimony.

The second bill of exception is that the court permitted J. W. Smith to testify that before he sold the land now claimed by plaintiff (which had been allotted to him by the partition of his father's estate), the defendant claimed a certain point to be the west end or corner of the dividing line between them, and that Abner Matthews also had so told him. This bill of exceptions does not state on what ground this testimony was objected to. If the testimony was objectionable, it was incumbent on the objector to specify his grounds of objection, otherwise his objection will not avail. But the testimony does not seem improper. That the defendant claimed to a certain line when the witness owned the contiguous land, and that the same had been pointed out to witness as the line or corner by Matthews, who made it as commissioner in making partition between the lands of witness and defendant, Matthews now being dead, was competent testimony to show where the corner was, and the extent of defendant's claim. Stroud v. Springfield 28 Tex., 665.

His third bill of exceptions is to the refusal of the court to permit him to read the transcript of the record in the supreme court in the Chambers case, which contained a copy of depositions of Reuben Hornsby, Sr., and Reuben Hornsby, Jr., offered to show the unreliability of the memory of Reuben Hornsby, Sr., who had in this case

been asked, and answered, that in that case he had never testified. Certainly the testimony was not admissible. That transcript could only prove that certain papers were copied in it; but whether Reuben Hornsby testified in the Chambers case, it tended not in the slightest legal way to establish. If it were sought to prove that fact, it could have been shown by the officer who took his deposition, or by the production of the depositions, and proof of his handwriting thereto. But a copy of a deposition contained in the transcript in the supreme court was wholly inadmissible for that purpose.

The second and material question presented is, whether the judge erred in giving or refusing charges.

It is insisted that the third and seventh paragraphs of his charge are inconsistent and contradictory, and tended to mislead the jury.

These paragraphs are as follows:

"3. If, therefore, you find that the parties did not then find the true line, that the line was established by *mistake*, or by fraud or misrepresentation of the defendant, you will disregard the line so established, and find for the plaintiff or defendant, according to the evidence in the case."

"7. If there was an agreement to establish a line between the owners of adjoining lands, and by agreement the line was established and acquiesced in by both, such agreement would be binding upon the parties and their vendees in the absence of fraud or misrepresentation; but if the agreement was only to make an attempt to find the true line, the line so found, if not the true one, is not a line established by agreement."

That the third paragraph just quoted was quite as favorable to the appellant as he could well claim, does not admit of controversy. Read in connection with what immediately precedes it, it will be seen that it has application rather to an attempt to ascertain whether the true

line could be found as fixed by the partition than any agreement for the adjustment and settlement of the boundaries between the parties. It is not for plaintiff to complain of the charge.

The seventh paragraph evidently has relation to the agreement for that purpose given in testimony,— a deliberate agreement for the running of their dividing lines, for the purpose of settling and defining that which was unsettled and obscure. And in such case we do not doubt that an agreement to establish their lines, and the lines established and acquiesced in by both parties, would be binding on them and their vendees, in the absence of fraud or misrepresentation. This charge is not necessarily erroneous or misleading because the word mistake is not included expressly. In truth, its use might rather have misled the jury than otherwise, by conveying the idea that if the line so agreed upon were not the true line, therefore other parties would not be bound by it. But the validity of an agreement for the settlement of the boundary does not depend at all upon the accuracy with which the line is run. Whether the parties were right or wrong in their belief that the line they established and agreed upon as the boundary of their lands was precisely where it ought to be, or where the original surveyor made it, was wholly immaterial. It was enough if there were doubt or dispute between them about it, and they determined to settle it upon that basis. If absolute exactness in defining the line were necessary to render such an agreement binding, it is not easy to perceive how it could be attained. Different surveyors with different instruments might locate the true line at different places. An agreement made to-day upon the survey of one, might be set aside to-morrow upon that of another, perhaps no less skillful or accurate. This would be to make agreements nugatory; whereas they are to be encouraged, favored and upheld, especially in these cases of doubtful bound-

aries. Such cases are proverbially vexatious, and breed ill-blood; and they are very apt to arise in this country. It is notorious that surveys have been hitherto very loosely made, and often by incompetent surveyors. Lines have been insufficiently marked, and corners designated by perishable objects. And the settling of the country and the destroying ax of the settler, and time, have obliterated the path of the surveyor and destroyed the monuments he made. And so, when the lines he ran cannot now be run, and the boundaries he fixed have become of doubtful identity, and the parties to be affected by them have mutually agreed that here he fixed his lines and set their bounds, such agreement should be held conclusive; not subject to be set aside or reopened upon any subsequent discovery that possibly a mistake was made in that agreement as to the true locality.

We believe this to be in accordance with the uniform decision of the court in this state. In Browning v. Atkinson, 46 Tex., 608, Mr. Justice Gould says: "It is competent for the owners of contiguous lands to settle the line of division between them; and if Stevens and Roberts, after the deed was made, and at a time when the land was theirs, fairly agreed upon and marked out their dividing line, though that line be subsequently, after long acquiescence, ascertained to vary somewhat from the course of the deed, it will be conclusive upon them and those claiming under them. And see George v. Thomas, 16 Tex., 74; Dalby v. Booth, 16 Tex., 566; Hoxey v. Clay, 20 Tex., 586; Smith v. Russell, 37 Tex., 256. In this last case it is said: 'Many authorities might be cited, holding that S. and W. (the parties) would both be bound and concluded by a line mutually recognized and established, though it were not the true original line.'"

It is conceded that a less liberal construction has been accorded to such agreements elsewhere. Cases have been cited where it was held that where an incorrect line was

acted upon, there must have been a knowledge of the true boundary in order to estop the party from asserting the true line (within the period of limitation), even though the intention was that the incorrect line should be fixed as the true boundary. We believe, however, that the more equitable rule is that which has been followed with us; and that where neighbors are in doubt about their boundaries, and both are ignorant of where they are, and their lines have become obliterated by time, and, for the purpose of settling and adjusting them, they in good faith establish divisional lines between them, and these lines are acted upon and acquiesced in even for a period within the statute of limitations, such agreements ought to be upheld and enforced. It has often been decided that they are not within the statute of frauds. Houston v. Sneed, 15 Tex., 307.

It is objected that the court erred in refusing the following charge asked by the plaintiff:

"If you believe, from the evidence, that the line run by the surveyor, John E. Campbell, for the defendant Smith and William Black, was not the correct line between them, to make such line binding upon Black and his vendee, Coleman, you must be satisfied that Black had knowledge of the true boundary line; even if it was the intention of the parties that the line made by Campbell should be held to be the true one, it cannot bind Black or his vendee, Coleman, unless the jury are satisfied that Black knew where the true line was when Campbell run the line for him and Alf. Smith.

"Refused as incoherent.

"J. P. RICHARDSON, Judge."

From what we have said, it will be seen that we do not concur with the appellant in the opinion that this charge is a correct exposition of the law applicable to the case. Besides, it leaves out of consideration altogether the inquiry as to the object in view in running the line; whether

it was done upon agreement for the very purpose of adjusting and settling the lost or unknown boundaries between them, and whether they had ratified and acquiesced in the line as run. The court was under no obligation to amend the charge. It was rightly refused for whatever reason.

The third ground of error assigned is that the verdict is against the testimony.

We have carefully read the statement of facts, and it is not clear to us that the verdict of the jury is without evidence to sustain it.

The controversy was as to the location of the dividing line of the lands of plaintiff, lot No. 2, and the land of the defendant, lot No. 1. In the partition of the lands of Smith, Sr., under which both parties claim, this line is described as "beginning at a stone mound, from which an elm bears S. 70 W. 1 vara, marked X, and the elm bears N. 70 E. 8 varas, marked X; thence S. 60 E. 1,250 varas, to a stake, from which an elm bears S. 85 W. 5 varas, marked X." The field notes of the survey are dated in June, 1846. Wallace was the surveyor.

The surveyor, Campbell, who made the survey by order of the court, says he was unable to find the corners as given in the field notes. He found, however, two elm stumps on the cleared ground in Alfred Smith's field, about thirty varas east of the line (the league line), "about the right distance apart, and in the right direction from each other, which might answer for bearing trees; that from this point S. 60 E. he traced a line, finding some hacks making a hacked line, evidently a line run by a compass, and, following it out, came near an elm tree with a cross on it on the east line of the 800-acre tract. The cross on that elm was old; not so old as the blazes on the 400-acre tract, which were old enough to have been made in 1846 (a tract run off at the time of the original survey), but older than the hacks on the 'hacked line.' He

found some six or eight trees hacked on this line. The cross on the elm tree faces right for the corner as he ran out this hacked line, but it is in the opposite direction to that called for by the field notes."

Corwin, a surveyor, corroborated the statement of Campbell as to the elm stumps and the hacked line from them upon which he found eight hacked trees. He traced that line and found it to run out to the north of that, the marked elm, so that the cross would not face the corner. The hacks on this line are not so old as the blazes on the 400-acre tract line.

Aaron Burleson was a chain carrier when Wallace run this 400-acre tract in 1846, and says it was a blazed line. He did not assist at running the other lines. He says that he knows the line claimed by Coleman (this hacked line); lived within three hundred yards of it from 1842 to 1858. He never saw any corner there. There was a dense thicket through which the line claimed by Coleman would have passed — so dense that one would have to crawl through it; and does not believe a line could have been cut through it without his knowing it. He was, prior to 1859, daily in the bottom and about that thicket.

This is the substance of the plaintiff's testimony as to the location of this line. It was shown that by this hacked line Coleman would have in his tract about twenty acres more.

On the other hand, the testimony for the defense shows that this hacked line claimed by Coleman as the line of division was not run by Wallace, the surveyor. The proof to that effect seems very conclusive. The hacks upon the line were not old enough — certainly not so old as the blazes upon the other lines run in 1846; and all the surveyors who testified say that they had followed many lines marked by Wallace; that he marked his lines with blazes, and never found one marked with hacks.

Again, the surveyor Pace says, that, assuming the X elm near the east line to be at the corner, the distance

from that point to Walnut creek would fall several varas short of the distance by the field notes. The X upon that elm faces an opposite direction from the assumed corner, and all the surveyors say that that is never the case. This surveyor says the hacks upon that line were about thirteen years old.

Reuben Hornsby, who was one of the commissioners who made the partition of these lands in 1846, and who was chain carrier with Wallace at the making of the survey, testified that the surveyor made the corners, but the commissioners showed him where to make the corners. He does not think the line between the lots Nos. 1 and 2 were marked in any way. He says the place where the commissioners made the northwest corner of the lot No. 2 (the Coleman land) was in a little ravine on the west side of the old Bastrop road, and about one hundred yards from the road; very near the fork of two gullies. This old Bastrop road run through what is now Alf. Smith's field and near the division corner. Looking toward Bastrop from Austin, the corner would be on the right hand side of the road; does not recollect the exact distance; it would be about one hundred yards. He says: "Last fall I found the place where I thought it was. . . . We were certain we were within a few feet of the exact corner made. I do not know that any of the witness' trees were standing. In 1873 I showed Alf. Smith very near where the corner was made. I carried him to the point I considered the corner. We fixed the division lines by means of corners. We divided the land with reference to value. We made an allowance because of the creek and gullies running through the land, which injured it a good deal. These were on the Alf. Smith tract, and I think his division was the largest."

This witness is eighty-one years old at the time of testifying and says his memory is not as good as it was twenty years ago.

Alf. Smith testified that he had lived on the land ever

since 1846; that if there was ever any line run between the tracts till Campbell ran it, he does not know it, nor did he ever hear of it. "I never saw any evidence of a line running through there. It was one of the worst thickets, and almost impossible to get through it. Abner Matthews, one of the commissioners, a few months after the partition, showed me the S. W. corner of my 102-acre tract, which is also the corner of the tract owned by the plaintiff. It was in the fork of two ravines or gullies, and there was a stake standing there then which stood there for several years; it was south of the old Bastrop road, some sixty or seventy varas, and south of the old adobe yard. He said this was the southwest corner of my land. It is the same place where Mr. Campbell afterwards made the corner when he ran the division line between me and Mr. Black."

James W. Smith testified: "I never knew of any dividing line being run between my tract and Alfred Smith's. The commissioner, Abner Matthews, told me that a stake south of the old Bastrop road on the west line of the Smith purchase was at the west end of the division line between the lots Nos. 1 and 2, as shown by the field notes, made by Mr. Wallace. While I owned the land my brother told me the northwest corner of my land was south of the old Bastrop road. This witness had no personal knowledge of the location of the corner.

This is the testimony on both sides bearing on the question whether the line claimed by plaintiff was the line actually made by the surveyor. It is sufficient to say of it, that it does not clearly establish that fact.

What it does establish to our satisfaction, however, is, that a state of case was presented which made it eminently judicious that Black, at the time the owner of the lot No. 2, and Alf. Smith, the owner of the lot No. 1, should agree upon the running of their lines and the settlement of their boundaries.

And that such agreement was made for that purpose, and that the lines were run by Campbell, the surveyor selected by them, and that the survey so made was fairly made, accepted by the parties and acquiesced in and acted upon, is abundantly proved by the testimony.

Coleman knew these facts. The line of the land so agreed upon was pointed out to him by Black, who sold to him when he purchased. He has all the land he bargained for at the time, and his tract is of the width called for in the field notes — four hundred and fifteen varas, — and within a small fraction of the full complement of one hundred and two acres. If the testimony of Hornsby, of Alf. Smith and James W. Smith can be relied upon, the survey made by Campbell was the true line between these tracts as directed by the commissioners of partition. The parties have put their fences up and acceded to it. There is not the slightest reason to believe that in the making of this agreement or the establishing of this line there entered any element of mistake, fraud or misrepresentation. It ought to stand.

Our conclusion is, that the verdict of the jurors was well warranted by the testimony, and should not be disturbed.

The proper disposition of this case is to affirm the judgment.

AFFIRMED.

[Opinion delivered May 17, 1881.]

Ch. J. MOORE did not sit in this case.