AMELIA P. BEARDSLEY *vs.* HENRY L. CRANE.

Argued Jan. 12, 1893.    Decided April 5, 1893.

| 52 | 537 |
| 57 | 140 |
| 52 | 537 |
| 72 | 444 |
| 52 | 537 |
| 82 | 146 |

**United States Survey of Public Land.**

The true corner of a governmental subdivision of land is where the United States surveyors in fact established it.

**Subdivision of Fractional Sections.**

Where, owing to meandered lakes, but one quarter corner post was established upon the ground on the boundary lines of a certain section, which post was on the south line thereof, the division line between the southeast and southwest quarters of said section must be ascertained by running a line due north from the quarter post to the meandered lake upon the north side of the section.

**Extrinsic Facts and Parol Evidence Excluded.**

Where the grant describes the premises conveyed by distinct and definite boundaries, from which the lands may be located, no extrinsic facts or parol evidence can be resorted to for the purpose of controlling or varying the description. The boundaries must be ascertained by the calls in the deed, where they are definite and distinct.

**Practical Location, when Controlling.**

Where there can be no real doubt as to how the premises should be located, according to certain and known boundaries described in the deed, to establish a practical location, different therefrom, which shall deprive the party claiming under the deed of his legal rights, there must be either a location which has been acquiesced in for a sufficient length of time to bar a right of entry under the statute of limitations, or the erroneous line must have been agreed upon between the parties claiming the land on both sides, and afterwards acquiesced in for a considerable time, or the party whose right is to be barred must have so conducted himself as to be estopped from asserting the true line. The evidence establishing such location should be clear, positive, and unequivocal.

**Time of Acquiescence.**

The "considerable time" above mentioned has not been limited or defined, is vague and uncertain, and necessarily must depend upon the particular circumstances of each case.

Appeal by plaintiff, Amelia P. Beardsley, from an order of the District Court of Hennepin County, *Lochren,* J., made September 24, 1892, denying her motion for a new trial.

Section thirty-five (35) in township one hundred and seventeen (117) north, of range twenty-three (23) west, in Hennepin county, is fractional, and lies on the south bank of Lake Minnetonka.  If it were a full section, its north line, except for a few rods at the northeast corner, would lie some distance into this lake.  Another lake, called Christmas Lake, encroaches upon the section from the east, so that the south two-thirds of the east line is lost in that lake.  A third lake, called Galpin's Lake, encroaches upon the section from the west, so that the point where the quarter post on the west line should stand is some distance out into this lake.  The government surveyors of the public lands could only establish the northeast and the southwest corners of the section and the quarter post on the south line.  See map of this section.

On January 7, 1881, Frank J. Stoddard owned the fractional southeast quarter of the section, and conveyed to William Chatfield a piece bounded as follows: "Commencing on the west line of the

southeast quarter of section thirty-five (35) in township one hundred and seventeen (117) north, of range twenty-three (23) west, sixty-eight (68) rods north of the southwest corner of said quarter section; thence north twenty-one (21) rods and ten (10) links; thence east sixty-nine and one-half (69½) rods to Christmas Lake; thence south-easterly along the bank of said lake twenty-three and one-half (23½) rods; thence west eighty (80) rods to the place of beginning; containing ten acres more or less." The parties soon after discovered that the distance to the lake was greater than was stated in the deed, and Chatfield paid Stoddard for the excess, over ten acres, and Stoddard, on May 29, 1883, made and delivered to Chatfield another deed of the land, describing it the same as in the first, except the length of the north line was stated to be ninety (90) rods, and the length of the south line one hundred (100) rods, and quantity twelve and one-third (12⅓) acres, more or less. This second deed recited that it was given to correct an error in the description in the first deed. This and the adjacent lands were then covered with timber.

Stoddard and Chatfield obtained the assistance of a neighbor who had some knowledge of surveying, and in the spring of 1881, ran out and marked what they supposed to be the north line of the land sold. In the summer of 1881, they built a wire fence along the line so located by them. Chatfield on September 3, 1884, conveyed to the defendant. Stoddard conveyed the adjacent land on the north to the plaintiff. She claimed that the wire fence was too far to the north and on her land twelve (12) feet at the west end and twenty-eight (28) feet at the east end at Christmas Lake, and brought this action in March, 1891, to recover possession of this narrow strip lying between the wire fence and the correct boundary line. Defendant contended that Stoddard had orally agreed with Chatfield that the wire fence should be the line between them; that they made a practical location of the boundary line which had ever since been acquiesced in by the parties interested.

At the trial, on January 27, 1892, defendant had a verdict, and the trial court refused to set it aside, and plaintiff appealed.

*Daniel Fish,* for appellant.

It is necessary in surveying this land, to ascertain the true position of the north and south quarter line. The other boundaries are not government lines, nor are any of them parallel with such lines. Stoddard owned the whole tract, and could carve it up and sell it in such parcels as he saw fit. And what parcels he chose to sell must be ascertained from a perusal of his deeds. Where the grant describes the premises by distinct and definite boundaries from which the lands may be located, no extrinsic facts or parol evidence can be resorted to, to control or vary the description. *Drew* v. *Swift,* 46 N. Y. 204; *Lawrence* v. *Palmer,* 71 N. Y. 607; *Armstrong* v. *Du Bois,* 90 N. Y. 95; *Fratt* v. *Woodward,* 32 Cal. 219; *Bond* v. *Fay,* 94 Mass. 86.

The position of the quarter post in the south line of the section as originally fixed by the government survey, is well known. There is no opposite corresponding quarter post on the north. In such case, the rule is to run *due* north for a quarter line. U. S. Rev. Stat. §§ 2396, 2397. In the absence of anything in the deed manifesting a contrary intention, it is always presumed that a rectangular figure is intended. *Massie* v. *Watts,* 6 Cranch, 148; *Holmes* v. *Trout,* 7 Pet. 171. Where the call is "eastwardly" or the like, if there is no point fixed for the termination of the line, the course will be presumed to have been intended to run at right angles to the base. *Fratt* v. *Woodward,* 32 Cal. 219. The reason is that without such construction the direction of the line is indefinite and uncertain, and it is not to be presumed that the parties intended to leave the direction in doubt. 2 Devlin, Deeds, § 1035, and cases cited.

There is no ambiguity in the deeds that would warrant a resort to parol evidence to make their meaning clear. There can be no difficulty in marking out on the ground the premises actually described. The starting point is definitely fixed, and the first course follows the quarter section line due north. By no possibility can the deeds be construed as covering the land sued for.

The answer sets up an oral agreement between Stoddard and Chat-

field whereby they established the north boundary line where the wire fence was placed. The theory of this defense seems to be, that it was competent for the parties to bind themselves irrevocably by parol, to a boundary differing from that described in the deed. Both parties supposed they had fixed the north line correctly, and acquiesced in that line because they so supposed. Afterwards it was discovered that the description covered twelve and a third acres, through an error of the surveyor, in the length of the tract. In measuring from the lake back to the west boundary, "a tally" (20 rods) was dropped. The excess was paid for, and a new deed taken, varying from the first deed only in the length of these lines and in the area supposed to be embraced in the description. There was never any question raised as to "where the boundary line ought to be." There was no compromise of a disputed boundary such as the courts have sometimes held to be conclusive. In the absence of such a dispute, a mere parol agreement, if there were one, is not binding upon either party. Land can be conveyed only by deed. The statute of frauds settles that. The utmost that can be claimed in this case is, that the line of the wire fence was established, and the fence erected, under the mutual belief of the owners that its site was the true boundary of the area conveyed. Both parties were mistaken, and the theory of the trial court seems to have been that such a mistake once made can never be corrected, unless the party having the advantage shall voluntarily surrender it. *Hartung* v. *Witte*, 59 Wis. 285; *Hass* v. *Plautz*, 56 Wis. 105; *Pickett* v. *Nelson*, 79 Wis. 9.

*Shaw & Cray,* for respondent.

When the second deed from Stoddard to Chatfield was made, Chatfield intended to buy all the land included in the boundary actually occupied by him, and up to that particular line of wire fence. The gist of the contention of plaintiff upon this evidence was, and is, that the evidence was incompetent, because in conflict with the general rule that parol evidence will not be admitted to vary the terms or description in a deed. But the application of the rule in this class of cases is subject to so many and diversified exceptions and variations, as to render it exceedingly precarious to rely upon. The intention

of the parties is to govern the question of boundary line. Parol and extrinsic evidence may be given to determine that intention, when there is an ambiguity or doubt in the deed itself. An ambiguity or doubt may arise either upon the language of the deed itself, or when that language comes to be applied to the *locus*. If, when a surveyor attempts to locate upon the ground the description in the deed, elements of uncertainty and doubt are found in the situation, which render the meaning and application of the description in the deed uncertain, then there exists an ambiguity or doubt, which may be solved by the admission of evidence of extrinsic circumstances. This case was such as to present such an ambiguity or doubt, and justified the court in admitting evidence of extrinsic circumstances to determine the real intention of the parties. *Waterman* v. *Johnson*, 13 Pick. 261.

It is elementary that agreements in respect to disputed boundary lines are not within the statute of frauds, because they cannot be considered as relating to the title. Tyler, Boundaries, pp. 254, 284, 285, 288. Evidence of what is called a practical location of the boundary was competent. In this case the line was agreed upon between the parties claiming the land on both sides of it, and acquiesced in for ten years. What we principally rely upon as being the feature of this case and coming within this doctrine is, that the line which we claim, has been agreed upon between the parties claiming the land on both sides thereof. *Lebeau* v. *Bergeron*, 14 La. An. 489; *Bolton* v. *Lann*, 16 Texas, 96; *Clark* v. *Tabor*, 28 Vt. 222.

COLLINS, J. Action in ejectment to recover possession of a narrow strip of land situated in a fractional section bordering upon three large meandered lakes. These lakes so encroach upon the section that its northwest and southeast corners could not be established upon the ground by the governmental surveyors, nor could quarter corner posts be placed upon the north or east or west boundary lines.

The northeast and the southwest corners were located, and also the quarter post upon the south line. A verdict was ordered in defendant's favor, and the appeal is from an order denying a new trial. Both parties claimed title through various conveyances from one

Stoddard. The answer alleged and admitted that plaintiff and defendant were coterminous owners of land situated in the section referred to, that the land therein owned by plaintiff was bounded on the south by defendant's land, and that the pending litigation grew out of a dispute concerning the actual location of the division line. The issue, as presented by the pleadings, was not complicated, but reduced to an inquiry as to the real location on the ground of defendant's north line. With this determined and fixed, the case was easily disposed of. If it was where the defendant claimed, the plaintiff had no cause of action. If, upon the other hand, any part of the strip described in the complaint lay north of this line, the plaintiff's right, according to the pleadings, to recover possession of the same, could not well be controverted. The deeds whereby Stoddard and his wife conveyed to Chatfield, and the latter conveyed to defendant, set forth in the answer and introduced in evidence by plaintiff, were admissible in evidence, as the most competent proof of the line in dispute. There were two of these deeds from Stoddard and wife to defendant's grantor, Chatfield,—one dated in 1881; the other, given to correct an error in description discovered in the first, bearing date 1883. In each of these conveyances the premises were described by metes and bounds; the starting point, which became the southwest corner of the tract, the west boundary line, the northwest corner, and the north boundary line, being the same,—except that the distance along said north line was increased from sixty-nine and a half (69½) to ninety (90) rods by means of the last deed. So that, when considering the merits of this appeal, either of these deeds might be referred to for the purpose of ascertaining the location of defendant's north line, as fixed therein. According to the last deed, so much of this description as bears upon the point in issue was as follows: "Beginning on the west line of the southeast quarter of sec. 35. * * * sixty-eight rods north of the southwest corner of said quarter section; running thence north 21 rods and 10 links; thence east 90 rods, to the lake shore." It has already been stated that the quarter post on the south line of the section had been fixed by the government surveyors, and there is no dispute between these parties as to its exact situation on the ground. The true corner is where the

United States surveyors in fact established it, whether such location is right or wrong, as may be shown by a subsequent survey. *Chan* v. *Brandt*, 45 Minn. 93, (47 N. W. Rep. 461;) *Cragin* v. *Powell*, 128 U. S. 697, (9 Sup. Ct. Rep. 203;) *Nesselrode* v. *Parish*, 59 Iowa, 570, (13 N. W. Rep. 746.) The starting point is, according to the deed, precisely 68 rods north of this post, on the west line of the southeast quarter, which is, of course, the dividing line between that and the southwest quarter of the section. The manner in which this dividing line must be run and fixed is beyond controversy. It is to be run from the quarter section corner post on the south boundary of the section, due north to the lake on the north side of the section. Rev. St. U. S. §§ 2396, 2397. This is also in conformity with the instructions received from the proper authorities at Washington according to the testimony of plaintiff's witness Cooley, a practical surveyor, who ran out and established defendant's west and north lines prior to the bringing of this action. Nor was this method of determining the lines described in the deed really questioned by defendant's witness Egan, also a practical surveyor, who had run the lines. The starting point being thus fixed, due north and 68 rods distant from the quarter corner post, the defendant's northwest corner was due north therefrom 21 rods and 10 links, and this was the point or corner from which his north line ran due east, at right angles from the west line, to the lake shore. It would seem that there should be no difficulty in establishing either of these lines upon the ground, nor do we understand from the testimony that either of the surveyors just referred to was in doubt when he ran the lines in accordance with the description found in the deed. The doubt appears to have arisen when the witness Egan attempted to locate a north line which would conform to a survey made by the witness Gould just prior to the making of the first deed to Chatfield, in 1881. Immediately after that conveyance, Stoddard, who then owned the land north of that which he had just conveyed to Chatfield, and the latter, joined in the building of a wire fence along what had been fixed as the dividing line between them by Gould, and which was supposed to be the line by all parties. The premises in dispute lie just south of this fence, it being contended by defendant that this fence is on the line. Ac-

cording to Cooley's testimony, this fence at defendant's northwest corner is *eight* feet north of the true line, and, as it deflects to the north as it runs easterly, it is considerably more than that distance north of the true line where it intersects the lake; and, according to the testimony of defendant's witness Egan, the fence at his northwest corner is *ten* feet north of the true line.

It is well settled that when the grant describes the premises by distinct and definite boundaries, from which the lands may be located, no extrinsic facts or parol evidence can be resorted to for the purpose of controlling or varying the description. The boundaries must be got at by the calls in the deed, when they are definite and distinct. *Drew* v. *Swift,* 46 N. Y. 204; *Lawrence* v. *Palmer,* 71 N. Y. 607; *Waterman* v. *Johnson,* 13 Pick. 261; *Bond* v. *Fay,* 12 Allen, 86.

But it is claimed by counsel for defendant that, while Stoddard and Chatfield were coterminous owners, a dividing line was agreed upon between them, upon which the fence was built, and which must now be held to be the true line. The facts were that when the former agreed to sell to the latter a tract of land out of a larger tract, running from his west line to the lake, and of sufficient width to embrace 10 acres, the witness Gould was employed to survey it, that its description by metes and bounds might be obtained. This he attempted to do, and stakes were driven along the supposed north line of Chatfield's purchase, and according to those stakes the fence was built. There was no controversy over this location for the division fence, for the parties had no reason to suppose the survey to be erroneously made. But, without going into details as to the mistakes made by Gould, it is obvious that his work was very inaccurate and unreliable. The rule of law which counsel attempt to apply is well understood, and may be thus stated: Evidence of what is called a "practical location" of the boundaries of real property is often competent in cases of controversy respecting division lines, and it is sometimes difficult to determine whether such evidence should be received or rejected. Where there can be no real doubt as to how the premises should be located according to certain and known boundaries described in the deed, to establish a practical location different

therefrom, which shall deprive the party claiming under the deed of his legal rights, there must be either a location which has been acquiesced in for a sufficient length of time to bar a right of entry under the statute of limitations, or the erroneous line must have been agreed upon between the parties claiming the land, on both sides thereof, and afterwards acquiesced in, or the party whose right is to be barred must have silently looked on while the other party acted or subjected himself to expense in regard to the land, which he would not have done if the line had not been so located. But to establish a practical location which is to divest one of a clear and conceded title by deed, the extent of which is free from ambiguity or doubt, the evidence establishing such location should be clear, positive, and unequivocal. There should be an express agreement made between the owners of the lands, deliberately settling the exact, precise line between them, and acquiescence for a considerable time, or, in the absence of proof of such agreement, it should be as clearly and distinctly shown that the party claiming has had possession of the premises claimed up to a certain, visible, and well-known line, with the knowledge of the owner of the adjoining land, and his acquiescence, continued for a considerable period of time. What this period is, has not been limited or defined, is quite vague and uncertain, and must necessarily depend upon the particular circumstances of each case. It has often been said that this acquiescence must have continued for a period of time scarcely less than that prescribed by the statute of limitations; and in some cases it has been held that the doctrine that an express agreement, recognizing an erroneous boundary line, will conclude a party, must rest, if tenable at all, upon the principle of estoppel. Upon the general subject, see Tyler, Bound. p. 288 et seq., and many cases cited; Hass v. Plautz, 56 Wis. 105, (14 N. W. Rep. 65;) Pickett v. Nelson, 79 Wis. 9, (47 N. W. Rep. 936;) Cleaveland v. Flagg, 4 Cush. 76; Russell v. Maloney, 39 Vt. 579; Krider v. Milner, 99 Mo. 145, (12 S. W. Rep. 461;) Coleman v. Smith, 55 Tex. 259; Smith v. Hamilton, 20 Mich. 433.

The most that can be urged in defendant's behalf in support of his claim to a practical location, which will conclude the parties, is that, misled by Gould's inaccurate survey, and in ignorance of his mistake,

the then coterminous owners of the land united in building a fence upon the supposed boundary, and for some nine years afterwards, still in ignorance of the mistake, they and their grantees acquiesced in treating and considering this fence as on the division line between their respective holdings. Certainly these acts did not conclude the parties.

Order reversed.

(Opinion published 54 N. W. Rep. 740.)