# JACOB MOSER v. NICHOLAS DOFFNER.[1]

March 11, 1910.

Nos. 16,442—(178).[2]

**Practical location of boundary — statutory rule.**

In an action of ejectment, whose determination depended upon the re establishment of government boundary lines in a given section, it is *held:*

1. "Practical location" fixed the eastern and western corners of the tract. The boundary line was the extension of the straight line between the corners thus established.

2. Section 578, R. L. 1905, and section 2396, R. S. (U. S.) providing that "the boundary lines which have not been actually run and marked shall be ascertained by running straight lines from the established corners to the opposite corresponding corners," prevails over the rule of survey prescribed by the federal land department in case of inconsistency between that statute and such rule.

Action in ejectment in the district court for Stearns county to recover possession of a tract of land containing about three acres and alleged to be a part of lot 10 in a certain section. The answer was a general denial. The facts are stated in the opinion. The second trial was before Giddings, J., who made findings and ordered judgment in favor of plaintiff. From an order denying defendant's motion for a new trial, he appealed. Affirmed.

*Donohue & Stephens* and *Stewart & Brower,* for appellant.

*J. D. Sullivan,* for respondent.

JAGGARD, J.

This was an action of ejectment, brought to recover possession of a strip of land, containing about three or four acres, claimed by plaintiff to be part of lot 10, and by defendant to be part of lot 7, both in section 7, in the town of Farming, Stearns county. This

[1] Reported in 125 N. W. 275, 127 N. W. 494.

[2] October, 1909, term calendar.

section 7 is practically a mile and a half wide, east and west, and some twenty rods more than a mile in length, north and south. The east one-third of the section was divided into the ordinary quarters. The balance of the section was cut up into sixteen lots, twelve of which the plat shows contain forty acres each. The other four, the tier along the west line, contain approximately thirty-seven acres each. "The section and quarter corners are all known with reasonable certainty, except the quarter corner on the west. The government plat and field notes show the location of this quarter corner in a pond. They show that a witness corner was placed on the section line 11.85 chains north of the true location of the quarter corner." The certified copy of the original plat, however, does not show this witness corner.

Plaintiff claims that the quarter corner was set on the edge of the pond, some eight or ten rods east from the section line. No trace of the quarter post, mound, bearing trees, or any other physical evidence of its location, is now visible; and it is the contention of the defendant that there is no evidence that the quarter post ever was located any other place than where the government notes and plat show it to have been. The section is irregular as to its north and south exterior lines, it being claimed that there is a kink or angle in the same, as the plats made by the surveyors show. This kink is in the north and south lines of the section, which makes an angle of some five degrees at the north and south quarter posts. The location of the lots fixed the southwestern corner of the northeast quarter of this section, called "Smith's post."

Plaintiff claimed that one Wilhelm had built the fence from the quarter section on the west line of the section easterly between Wilhelm's land and that of the adjoining proprietor. He insists that the true way to complete the subdivision of the section is to run a main line from the so-called Smith's post to the east end of Wilhelm's fence, as nearly parallel with the north and south lines at the section as is practicable. This would give the land in dispute to plaintiff.

Defendant claims that the quarter corner on the west was lost, and that its location cannot be found at this time, and denies that

111 M.—30.

there had been a practical location of the east and west quarter section lines some rods north of the location of the west quarter post, as claimed by plaintiff, which would be binding upon him. He insists that the proper way to locate the quarter line between land of plaintiff and land of defendant is to run a straight line from the quarter post on the west side located by proportionate measurements to the known quarter post on the east side.

Two different trial judges found in general that the plaintiff was the owner of the premises. This appeal is taken from the order, made on the second trial, denying defendant's motion for a new trial.

The conclusion of the trial court that plaintiff was the owner of the premises may have rested upon the proposition that the proper survey of the land required that the subdivision of the section should be made by running a straight line from Smith's post to the east end of Wilhelm's fence. Its conclusion must be sustained, if this proposition was true, and we are of opinion that it was. It is the well-settled law of this state that a practical location constitutes a boundary line. Beardsley v. Crane, 52 Minn. 537, 54 N. W. 740; Benz v. City of St. Paul, 89 Minn. 31, 93 N. W. 1038. The practical location of Smith's post is admitted. We are of opinion that plaintiff established a practical location of the easterly corner of the central quarter, viz., the easterly end of Wilhelm's fence. The question is purely one of fact, to be determined by the record only.

Defendant has urged with great force, emphasized by careful examination of the record, that the relevant testimony fails to sustain the inferences for which plaintiff contends. It has, however, produced on our minds the conclusion that there was testimony, adequate within the somewhat stringent rule on the subject, to justify the conclusion of the trial court, although it was not always clear, especially as to the actual location of the westerly starting point of the fence. The evidence as to the use of the premises here in controversy by the plaintiff and the conversion by him from wild to tame land, and as to the necessary expense involved, is certain enough. The detailed discussion of the evidence would serve no useful purpose.

The most serious doubt in the case arises whether the line should be drawn (1) from Smith's post to the east end of Wilhelm's fence straight, and so as to be as nearly parallel to the north and south lines as practicable because of the "kink" in the section lines previously referred to, or (2) from Smith's post due west to a westerly point determined by a continuation of the lines of Wilhelm's fence until it touches the west section line. If the first survey be adopted, it would give the plaintiff all the land. If the second survey be adopted, it would give the plaintiff about two-thirds and defendant about one-third of the land. While the matter is subject to considerable doubt, we think the former survey should be accepted.

The same sort of evidence which established Smith's post in the west established the east end of Wilhelm's fence as the corner post on the west. The one was according to natural reason as much a starting point as the other. No reason appears for rejecting the nearer corner and accepting the remoter on the section line. The natural completion of the boundary is made by drawing a straight line from one established corner to the neighboring established corner. So to do tends to preserve the parallelism of the north and south boundaries of the lot with the north and south boundaries of the section, or, in plain English, avoids an awkward jog in boundaries. This accords also with plaintiff's actual use of the premises and his necessary expenditure thereon, and gives plaintiff more nearly the same acreage as the owners of similar and neighboring lots. This we regard as a legitimate sequence or extension of the doctrine of "practical location," under the peculiar circumstances here presented.

Such a survey is consistent with the federal law on the subject. Plaintiff insists that the proper way for running this quarter section line was governed by the following rule of the land department: "In a fractional section, where no opposite corresponding corner has been or can be established, any required subdivision line of such section must be run from the proper original corner in the boundary line due east and west or north and south, as the case may be, to the watercourse, Indian reservation, or other boundary of such section, with due parallelism to said lines." The defendant

contends that the following rule is the one which controls the running of controverted lines: "That all subdivisional lines of a section running between corners established in the original survey of a township must be straight lines running from the proper corner in one section line to its opposite corresponding corner in the opposite section line."

If it be conceded that this is not a fractional township, for which plaintiff contends (see Goltermann v. Schiermeyer, 111 Mo. 404, 19 S. W. 484), and that defendant correctly construed the rule which he invokes, his conclusion does not follow; for this case is controlled by section 2396, R. S. (U. S.)[1] which reads as follows: "The boundary lines which have not been actually run and marked shall be ascertained by running straight lines from the established corners to the opposite corresponding corners." It is to be noted that the primary difference between the rule for which defendant contends and the statute is that the rule requires the line to be drawn to the "corner in the opposite section line;" the statute, from the "established corners to the opposite corresponding corners." Section 578, R. L. 1905, requires that in subdividing parts of sections and in re-establishing lost government corners the county surveyor shall follow the rules established by or pursuant to the acts of congress. The act of congress naturally prevails over the rule for the land department pursuant to it, where an inconsistency has arisen. It accords with the terms of the law to run the boundary line in this case from the established corner—Smith's post—to the corresponding corner at the east end of Wilhelm's fence.

It follows that the determination of the trial court must be affirmed.

O'BRIEN, J. (dissenting).

I dissent. The plaintiff owns lot 10 and the defendant lot 7 in the section described in the opinion of the majority. Lot 7 is immediately north of lot 10 and of equal width. The dispute is entirely with reference to the line which, constituting the south

[1] U. S. Comp. St. 1901, p. 1473.

boundary of lot 7, is the north line of lot 10. These lots meet at the center of the section, so that it is conceded that the true east and west quarter section line, if the same can be located, is the correct line dividing the lots. I think this line has been and can be located. The location of the east quarter post is admitted, and in my judgment the west quarter post can be as definitely located; hence the east and west quarter line of the section is a straight line between those two points. If, however, the west quarter post is taken to be as claimed by Wilhelm, who says he found this point many years ago, then the true division is a straight line from the west quarter post, as located by Wilhelm, to the conceded quarter post on the east. Neither of these are the lines claimed by plaintiff.

A practical location, if made by the parties and relied upon to the extent held necessary in Beardsley v. Crane, 52 Minn. 537, 54 N. W. 740, would, of course, be controlling; but to my mind there is no evidence sufficient to show any such location. The evidence shows that the owners of lands in this section both to the east and west of lots 7 and 10 did establish lines for their own lands, by the production of none of which, however, could a continuous straight line be drawn between the quarter posts. The evidence is not sufficient to show that the respective owners of lots 7 and 10 ever made any definite agreement as to the lines dividing their lands, and they were the only persons who could so agree. There is no claim that the plaintiff has title by adverse possession.

I do not think we have any right to attempt to equalize the acreage in the lots, or prevent irregularities in the lines throughout the section generally. If the defendant is the owner of the land, our inquiry is ended.

BROWN, J. (dissenting).
I concur in the views expressed by Mr. Justice O'BRIEN.

On July 22, 1910, the following opinion was filed:

JAGGARD, J.
On motion for reargument, defendant insists that this statement

in the original opinion was incorrect: "The practical location of Smith's post is admitted." Upon the express assumption, however, that the court was mistaken, and that the matter was in dispute, the same conclusion follows; for we are all agreed that the record shows the practical location of Smith's post, although the minority is of opinion that this is not material.

The remaining argument is addressed to the evidence, summarized in the opinion, which tended to establish a "practical location of the easterly corner of the central quarter, viz., in the easterly end of Wilhelm's fence." We have examined the record in the light of defendant's reargument, and reach the conclusion originally announced. The controversy turns primarily on the term "practical location." The court regarded its theory as to plaintiff's right to prevail as a "legitimate sequence or extension of the doctrine of practical location under the peculiar circumstances here presented." Authority and reason are with the original opinion. "Practical location," or at all events the physical acts of essentially the same nature, may establish boundaries in any one of three ways: (1) They may create title by prescription; (2) they may operate through estoppel to silence objection; (3) the title they establish may rest on acquiescence resulting in reputation or general recognition. It is immaterial whether the last way of establishing boundaries be regarded as literally practical location, or as an extension of the general principle, as it was treated in the original opinion. Controversy may be justified as to the proper terminology; but it is impossible to reach the conclusion for which defendant contends without ignoring or overruling the considerable body of decisions on the subject otherwise unassailed, which defendant does not appear to have considered. The usage of the court was, we think, correct.

It is clear at all events that the original liberality in proof of public boundaries has been largely extended to private boundaries, and that these may be shown by reputation or tradition, as by witnesses who assisted in early surveys, by improvements made by strangers, by hearsay, and by other testimony ordinarily excluded because res inter alios acta. The best brief, but complete, discussion of this subject, we have found is in 2 Enc. Ev. 722–729, and

see note 87, p. 724, and note 91, p. 725. In brief, the law sometimes disregards the ordinary rules of evidence as to hearsay, the best evidence, res inter alios acta, and the like, when necessary, and, especially in cases of boundaries, uses the best evidence obtainable.

A majority of the court adhere to the original opinion.