IN RE APPLICATION TO REGISTER TITLE TO
REAL ESTATE.
ARTHUR LEIGH SIMMS AND OTHERS v. SARAH FAGAN
AND OTHERS.
SARAH FAGAN v. ARTHUR LEIGH SIMMS AND OTHERS.[1]

December 31, 1943.

Nos. 33,469, 33,470.

[1]Reported in 12 N. W. (2d) 783.

*Covell & Root* and *Strong & Strong*, for appellant.

*Oscar G. Haugland* and *Theodore H. Wangensteen*, for respondents.

YOUNGDAHL, JUSTICE.

These appeals by Sarah Fagan are from two judgments, one determining title in respondents to a strip of land 4.2 feet in width adversely to appellant, and the other adjudging loss of an easement by appellant through her abandonment and nonuser thereof.

In 1940, respondents, hereinafter referred to as Simms, made application for a Torrens title to the northeasterly or rear 59.2 feet of lot 10, block P, Tuttle's Addition to St. Anthony in the city of Minneapolis. They were the record title owners of the rear 55 feet thereof. Appellant, hereinafter called Fagan, answered, claiming title to all of lot 10 except the rear 55 feet thereof, and claiming further an easement over the northwesterly 10 feet and the northeasterly or rear 10 feet of the Simms property. Fagan holds the record title to all of lot 10 except the rear 55 feet thereof. Fagan had previously brought suit against Simms to enjoin the obstruction of the claimed easement. The cases were consolidated for trial and a referee appointed to hear the testimony and make findings of fact and conclusions of law. His amended findings, adverse to

Fagan in both cases, were approved by a judge of the district court, and judgments entered accordingly. Fagan appeals therefrom.

Lot 10 as platted fronts on Fourth street southeast and runs along Fourteenth avenue southeast toward Fifth street. According to the plat, it is 66 feet in width and 165.87 feet in length. The .87 of a foot which the survey overran the length stated on the plat does not affect the decision.

On July 9, 1887, Alfred G. Wilcox, predecessor in title to both Simms and Fagan and the then owner of all of lot 10, divided the property by a conveyance of the rear 55 feet, which started the separate chains of title. By the same instrument, the 10-foot easement for an alley, here in controversy, was created. Two buildings, hereinafter referred to as the Fagan and Simms buildings, were erected on lot 10 snug against each other, with each structure laterally supported by its own side wall. It is agreed that the Fagan building was erected and standing in place in 1887. The record does not reveal exactly when the first Simms building was erected. The permit therefor was dated May 9, 1887, and was issued to Carleton & Copp. Copp was one of the grantees in the conveyance from Alfred G. Wilcox, the original grantor. While the permit shows on its face that the building was to be completed on July 1, 1887, there is nothing in the record to indicate that it actually was finished on that date. One witness testified that both buildings were standing in place snug against each other in 1888. This is the only testimony we find in the record relating back to that time. It is undisputed that the Simms building was erected 4.2 feet over the boundary and on the Fagan land according to the descriptions of the properties in the respective deeds thereof. The two buildings remained in place until approximately April 11, 1904, when the old Simms building was removed and the present Simms structure erected, leaving a space of 4.2 feet in the rear and 4.25 feet in the front between the two buildings. The title to this strip is claimed by Simms by adverse possession and practical location of the boundary line.

In using the easement for driveway purposes, it was necessary to drive on a portion of the rear of lot 9 in order to execute the sharp, right-angle turn. This practice continued until 1924, when one Degnan became the owner of lot 9. He put up a fence between the two lots and a gate. Simms had torn up the paving in the alley back of their building and subsequently built a roof-covered stairway on the northeasterly side of their building. Finally this was enlarged in 1937 and converted into a hamburger shop, which extended to the Fourteenth avenue entrance. The new structure completely closed the driveway for every purpose. The title to the alley is claimed by Simms as far as it is appurtenant to their property.

Fagan assigns as error the holding of the trial court (1) that title to the 4.2-foot strip between the buildings vested in Simms by adverse possession; (2) that a boundary line between the two original buildings was established by practical location; (3) that the easement for an alley right of way over the Simms property had been discharged by abandonment and by adverse user by Simms.

■ The original findings of the referee determined title to the 4.2-foot strip to be in Simms by adverse possession. Subsequently the findings were amended to include a determination of practical location of the boundary line between the original Fagan and Simms buildings. Simms contend that adverse possession commenced approximately on May 9, 1887, on the theory that the original Fagan and Simms buildings were in place and snug against each other on that date. From the record we cannot say with certainty that such possession did commence in the year 1887. It is conceded, however, that the buildings were in place in 1888, the following year. Whether the period of adverse possession is to be considered as commencing in 1887 or 1888 makes no difference. It is evident that Simms did not have continuous adverse possession for the necessary statutory period of 15 years. Their continuous possession was interrupted and broken by two conveyances made by the National Bank of Commerce, which had acquired title

in 1889 to the front 110 feet by foreclosure of a mortgage made by Alfred G. Wilcox and wife. In 1890, the bank, by general warranty deed, conveyed to the Fagan predecessors in title all of lot 10 except the rear 55 feet. In 1892, the bank acquired title to the remaining 55 feet from Simms' predecessors in title by a quitclaim deed from James W. Raymond and wife, grantees of Wilcox, and the then record title owners of the property and in actual possession thereof. It is clear that upon execution of the quitclaim deed, whatever right, title, or interest was vested in or claimed by the Simms predecessors in title, adversely or otherwise, in the 4.2-strip, inured as a matter of law to the bank and automatically to the Fagan predecessors in title. 2 Dunnell, Dig. & Supp. § 2369; Sandwich Mfg. Co. v. Zellmer, 48 Minn. 408, 51 N. W. 379; Rooney v. Koenig, 80 Minn. 483, 83 N. W. 399; Bradley Estate Co. v. Bradley, 97 Minn. 161, 106 N. W. 110. The covenant of warranty in the bank's deed of 1890 to the Fagan predecessors in title operated to carry any after-acquired title to the rear 55-foot strip, and it was automatically vested in the grantees. It would thus seem certain that whatever claim the Simms predecessors in title may have had to the 4.2-foot strip was lost by these conveyances. If, following the bank's conveyances, the Simms predecessors in title again assumed possession of the strip adverse to Fagan, it could not have continued sufficiently long for the necessary statutory period to elapse, since the Simms structure was removed in 1904. Simms' counsel does not seriously contend, in either his brief or on oral argument before this court, that the interruption was not fatal to the vesting of title by adverse possession during this period of time. He cites no authority to the contrary. Rather, he urges that the referee intended by his findings to extend the period of adverse possession from 1904 to the filing of this action. We believe it was the intention of the trial court to limit the period of adverse possession to April 11, 1904; but, were such not the case, the erection of the new Simms structure 4.2 feet from the Fagan building in that year, and the conduct of the parties subsequent to that time,

negatives any intention on the part of Simms to claim this strip of land.

In 1931, Simms made an offer to Fagan to purchase this disputed strip for $1,000. This offer was made, according to Simms, for the purpose of permitting them to erect a contemplated stairway to the new Simms building on this piece of land. It would appear that in 1931 the Simms were conceding that Fagan owned this piece of property. Sarah Fagan testified to a conversation between herself and Leigh Simms as follows:

"A. Leigh Simms came in and said they wanted to remodel the upstairs of their building, and in order to do that they wanted to buy this 5-foot areaway. He said they wanted to put the stairway in the areaway.

"Q. Instead of in the building?

"A. Yes, they would have to cut in the building and it would interfere with their display space and they didn't want to do that. He offered me $1,000."

This conversation is corroborated by Leigh Simms as follows:

"Q. Did you have a conversation with Sarah Fagan at her house?

"A. Yes.

"Q. When was that?

"A. Several weeks after I had spoken to Ed.

"Q. And what was that conversation?

"A. In regard to the strip in between the two buildings.

"Q. What did you say?

"A. That I would like to purchase the strip between the two buildings.

* * * * *

"Q. Did you tell her any amount you would be willing to pay?

"A. I told her I was ready to offer $1,000 for it."

The offer was not made in contemplation of litigation, as Simms did not anticipate a lawsuit at that time. Another incident indicating the attitude of the parties with reference to this strip is the

erection by Fagan in 1931 of a chimney on her building which protrudes into this 4.2-foot strip. No objection appears to have been made by Simms. They permitted this to be done without complaint. This attitude is entirely inconsistent with a claim of title by Simms to the property. Evidence of adverse possession is to be construed strictly and is not to be made out by inference or presumption, but by clear and positive proof. The burden of proving the essential facts which create title by prescription rests upon the party who asserts it. Hoverson v. Hoverson, 216 Minn. 228, 12 N. W. (2d) 501. We conclude that the Simms have failed to sustain their burden of proving title to the 4.2-foot strip by adverse possession.

■ It is contended by Simms that when Wilcox executed his conveyance dividing lot 10 in 1887 it was his intention to establish a boundary line between the two buildings by practical location. Since the record is silent whether the Simms building was in place on that date, we must indulge in speculation to conclude that there was any such intention. The building permit was taken out in the name of Carleton & Copp, not in the name of Wilcox. It is a reasonable inference, therefore, that Copp, one of the grantees, erected the structure, and not Wilcox, the grantor, and that Carleton & Copp had at least an equitable title to the property on May 9, 1887, arising by virtue of some agreement to purchase the property from Wilcox. We cannot say, therefore, from the record, that when Wilcox conveyed the property he did so with the buildings snug in place against each other so as to spell out any intention on his part to establish a boundary line between the two buildings. A contrary inference is reasonable. Further, we do not believe the record indicates any intention of the parties to establish a boundary line by practical location after July 9, 1887. To establish a boundary line by practical location, it must appear that (1) the location relied upon must have been acquiesced in for a sufficient length of time to bar a right of action under the statute of limitations; or (2) the line must have been expressly agreed upon by the interested parties and afterwards acquiesced in; or (3) the parties whose rights are to be barred must, with knowledge of the true line, have silently

looked on while the other party encroached thereon and subjected himself to expense, which he would not have done had the line been in dispute. 1 Dunnell, Dig. & Supp. § 1083; Beardsley v. Crane, 52 Minn. 537, 54 N. W. 740; Benz v. City of St. Paul, 89 Minn. 31, 93 N. W. 1038; Romanchuk v. Plotkin, 215 Minn. 156, 9 N. W. (2d) 421. Simms' claim of an agreement is founded upon the erroneous assumption that Wilcox conveyed the property with the buildings snug against each other. Since there is nothing in the record to indicate an express agreement between the parties or that any improvements were made by mutual consent, we are here concerned only with the question whether the Fagan predecessors in title acquiesced in a boundary line between the two buildings for the necessary statutory period. In order to establish practical location of a boundary by acquiescence, it must appear that such acquiescence was with knowledge of the exact boundary line as described in the instrument of conveyance. The claim of practical location rests upon the principle of estoppel, and without evidence of knowledge one of the essential elements to create an estoppel is missing. In Benz v. City of St. Paul, *supra,* the court in passing on this question said (89 Minn. 39, 93 N. W. 1040):

"* * * Defendant Stevens did not know, at the time of the erection of plaintiff's house, the precise location of the true boundary line, and he was not aware of the fact that plaintiff had extended his house over the true line, and he did not knowingly permit him to do so. So far as the erection of the house is concerned, there is clearly no evidence in the record upon which to base an estoppel by conduct."

There is no showing of knowledge of the true line in this case, nor any testimony from which knowledge may be inferred.

The original Simms building was removed in 1904, and the new building was erected 4.2 feet from the Fagan building at the rear and 4.25 feet from the front. This change is significant insofar as it indicates the intention of Simms to protect their new building against any possible claim of title by the Fagans to this strip of

land. Although Mrs. Simms testified that the reason for placing their new building at that distance from the property line was to provide for an air space between the structures, this does not, however, destroy the reasonable inference that the Simms were taking a precautionary measure. In the instant case it appears that the Simms, by the erection in 1904 of their new building 4.2 feet from the Fagan building, their offer to purchase the strip for $1,000 in 1931, and their acquiescence since 1931 in the erection of the chimney upon the Fagan building, have placed a practical construction upon the deeds inconsistent with the trial court's holding as to adverse possession or practical location of the boundary line. In order to ascertain the intention of the parties as to the meaning of the deed, consideration may be given to the practical construction placed upon the deed by the parties themselves. Sandretto v. Wahlsten, 124 Minn. 331, 144 N. W. 1089. We hold, therefore, that the trial court's conclusion that Simms had procured title to this 4.2-foot strip either by adverse possession or practical location of the boundary line was erroneous.

■ Fagan contends that the finding of abandonment of the 10-foot easement is not sustained by the evidence, and that at most the testimony shows a nonuser, which is not in itself sufficient to establish an abandonment. An easement may be lost by abandonment though originating in grant. 2 Dunnell, Dig. & Supp. § 2855; Norton v. Duluth Transfer Ry. Co. 129 Minn. 126, 151 N. W. 907, Ann. Cas. 1916E, 760. Mere nonuser of an easement will not extinguish it. There is agreement among the authorities that, in cases where an easement is created by grant, deed, or reservation, no duty is thereby cast upon the owner of the dominant estate thus created to make use thereof or enjoy the same as a condition to the right to retain his interest therein. Annotations, 1 A. L. R. 884; 66 A. L. R. 1100; and 98 A. L. R. 1292; 28 C. J. S., Easements, p. 724, § 60; 17 Am. Jur., Easements, p. 1026, § 142; Norton v. Duluth Transfer Ry. Co. *supra*. Abandonment, however, occurs when nonuser is accompanied by acts clearly evidencing an intention to abandon. Norton v. Duluth Transfer Ry. Co. *supra*. The

testimony offered in some instances is conflicting and directly contradictory, but must be resolved on review most favorable to Simms. It is agreed that the owner of lot 9 erected a fence with a gate on the property line between the two lots, thereby preventing those using the alley from trespassing on his property, and that thereafter Simms set a post in cement in the 10-foot right of way immediately in front of the gate. Prior thereto, Simms had torn up the paving in the alley back of their building. There does not appear any serious objection on the part of Fagan to these acts. In 1936, Simms obstructed the alley leading into Fourteenth avenue southeast by erecting a covered stairway which projected some three feet into the right of way. Later this covered portion was extended and converted into a hamburger shop which completely closed the alley. For a time Simms closed the entrance to Fourteenth avenue by chains secured by a padlock. Since the Fagan and Simms buildings were at all times used for commercial purposes, the primary use of the alley was for delivery of merchandise. After the change was made in the rear of lot 9 in 1924, it was impracticable, if not impossible, to drive a delivery truck through the alley. Certain tenants of the Fagan building arranged for other means to make deliveries to the rear of the Fagan building. This was accomplished by renting space on an adjoining lot in which to park their delivery trucks and also for the purpose of turning around in order to make their exit by way of the Fourth avenue entrance. It is true, as Fagan contends, that the fact that automobiles could not execute the sharp turn in the right of way would not, of itself, be sufficient to destroy Fagan's right of easement. Presbyterian Church v. Harken, 177 Iowa 195, 158 N. W. 692. Yet it is one of the factors that may be taken into consideration on the question of intention to abandon. A change in the conditions which originally caused the creation of the easement, such as difficulty of access and obtaining other means of ingress and egress, are factors to be taken into consideration in determining such intention. Doyle v. Babcock, 182 Minn. 556, 235 N. W. 18. We are not unmindful of the fact that there are some circumstances, in-

cluding certain conversations between the parties, which are inconsistent with the finding of abandonment. The issue has caused us considerable difficulty. We believe that a finding that there was not an intention to abandon would have been justified from the evidence. Abandonment, however, is a question of fact. 17 Am. Jur., Easements, p. 1026, § 142, and cases cited. As a court of review, we are confronted with the question whether there was any evidence reasonably tending to sustain a finding of abandonment. After a careful consideration of the voluminous record before us, we conclude that such a finding has sufficient support in the evidence. Since we reach this conclusion, we do not find it necessary to consider the effect of the action of the condemnation proceedings upon the easement.

Affirmed on the issue of abandonment of the easement, and reversed as to the ownership of the 4.2-foot strip of land.

MR. JUSTICE LORING, absent because of accidental injuries, took no part in the consideration or determination of this case.

